UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| TCW HIGH YIELD FUND, ) | |
| ) | |
| Plaintiff, ) | **3  05    560  17** |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| PRICEWATERHOUSECOOPERS LLP, ) | JURY DEMAND |
| JAMES R. BULLOCK, LESLIE W. ) | |
| HAWORTH, HENRY B. TIPPIE, ) | |
| JAMES L. WAREHAM, PAUL R. ) | |
| HUMPHREYS, KENNETH W. WINGER, ) | |
| MICHAEL J. BRAGAGNOLO, ) | |
| and TD SECURITES (USA) INC., ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff TCW High Yield Fund ("Plaintiff"), by its undersigned counsel, makes the following allegations against PricewaterhouseCoopers LLP, James R. Bullock, Leslie W. Haworth, Henry B. Tippie, James L. Wareham, Paul R. Humphreys, Kenneth W. Winger, Michael J. Bragagnolo, and TD Securities (USA) Inc. (collectively, "Defendants").

## NATURE OF THE ACTION

1.      In reliance upon the financial statements published by Safety-Kleen Corporation ("Safety-Kleen") and/or its predecessor, Laidlaw Environmental Services, Inc. ("LES") (together, the "Company"), Plaintiff purchased 9¼ % senior notes due in 2008 (the "2008 Bonds") which were issued by a wholly-owned subsidiary of LES and 9¼ % senior notes due in 2009 ("2009 Bonds") which were issued by Safety-Kleen (collectively, the "Bonds"). Unbeknownst to

Plaintiff at the time of its purchases, the Company's financial statements upon which Plaintiff based its purchase decisions were materially false and misleading.

2.      On March 6, 2000, the Company announced that it had uncovered material "accounting irregularities" in its financial reports, leading it to place its three top executives – Defendants Kenneth W. Winger ("Winger"), Michael Bragagnolo ("Bragagnolo") and Paul R. Humphreys ("Humphreys") – on leave while a Special Committee appointed by Safety-Kleen's Board of Directors ("the Board") investigated the extent to which the Company would need to restate its financial reports for prior periods.  Winger, Bragagnolo and Humphreys all subsequently resigned as officers and directors of the Company.

3.      On March 9, 2000, the Company informed the investing public that PricewaterhouseCoopers LLP ("PwC"), the Company's accountant, had withdrawn its previously issued reports on the Company's financial statements for the fiscal years ended August 31, 1999, 1998 and 1997.  These included the very financial statements upon which Plaintiff relied in purchasing Bonds.

4.      In response to the Company's announcements relating to the accounting irregularities, the value of the Bonds plunged dramatically, losing over 90% of their value by March 16, 2000.  By June 9, 2000, a mere three months after the disclosure of accounting irregularities, the Company had defaulted on the Bonds and filed for Chapter 11 bankruptcy protection.

5.      Following an extensive internal investigation by the Company and a forensic audit of the Company's financial statements by Arthur Anderson LLP ("Arthur Anderson"), the Company issued a Form 10-K/A (the "Restatement") containing restated financial statements for

-2-

the fiscal years ended August 31, 1997 ("fiscal 1997"), August 31, 1998 ("fiscal 1998"), and August 31, 1999 ("fiscal 1999"). The magnitude of the Restatement was tremendous, decreasing the Company's net income by over half a billion dollars for the three fiscal years. Another $800 million in errors were detected which the Company was unable to tie to a specific year. The Restatement constitutes an admission that the previous financial statements for fiscal 1997, 1998 and 1999 -- the ones upon which Plaintiff relied in purchasing the Bonds: (a) were materially false and misleading; (b) did not accurately reflect the true picture of the Company's financial condition; and (c) did not comply with GAAP when they were issued. Indeed, GAAP prohibits restatements unless the original statements were materially false at the time they were issued.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331, 1337 and 1367.

7.      The claims herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; Section 18 of the Exchange Act, 15 U.S.C. § 78r; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and common law.

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the preparation and dissemination of false and misleading statements to the investing public, occurred in substantial part in this District, as the Company's principal place of business was located in this District during the time period relevant to this action. In addition, the Judicial Panel on

-3-

Multidistrict Litigation has entered an order centralizing all federal securities litigation related to the issues in this case in this Court.

9.      In connection with the acts, conduct, and course of conduct alleged in this Complaint, the defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

## THE PARTIES AND OTHER
## RELEVANT ENTITIES

**Plaintiff**

10.      Plaintiff TCW High Yield Fund is a collective investment trust whose participants are restricted to qualified employee benefit trusts or governmental plans or units.  The Trust Company of the West ("TCW") is the trustee of the TCW High Yield Fund, and manages that fund's investments. Pursuant to an agreement between Plaintiff and TCW, TCW makes all of the investment decisions on behalf of Plaintiff.

11.      On May 21, 1998, TCW purchased $800,000 principal amount of 2008 Bonds on behalf of Plaintiff, at par value.  On March 4, 1999, TCW caused Plaintiff to purchase another $55,000 principal amount of 2008 Bonds, at 104.25% of par value, from another account managed by TCW.

12.      On May 10, 1999, TCW purchased $1,100,000 principal amount of 2009 Bonds on behalf of Plaintiff, at par value.

13.      When the potential accounting irregularities were disclosed on March 6, 2000, Plaintiff continued to hold all of $855,000 principal amount of 2008 Bonds and $1,100,000

-4-

principal amount of 2009 Bonds. Plaintiff held those Bonds until July 2002, when it sold the 2008 Bonds for 1.25% of par and the 2009 Bonds for 3.25% of par.

**Safety-Kleen**

14.    Safety-Kleen, a non-defendant in this action, is a Delaware corporation which, at all times relevant to this action, had its principal executive offices at 1301 Gervais Street, Suite 300, Columbia, SC 29201. Through its subsidiaries, Safety-Kleen provided industrial waste services designed to collect, process, recycle and dispose of hazardous and industrial waste streams. The Company provided these services from approximately 280 collection and processing locations in 45 states and seven Canadian provinces.

15.    Safety-Kleen was formed when LES (through its subsidiary, LES, Inc.) acquired all of the outstanding capital stock of the former Safety-Kleen Corporation ("Old Safety-Kleen") in a tender offer and subsequent merger completed in May 1998 (the "Safety-Kleen Acquisition"). As part of the Safety-Kleen Acquisition, the entire Board of Old Safety-Kleen was replaced by directors of LES, including Defendants Bullock, Haworth, Tippie, Wareham, and Winger. LES subsequently announced on June 22, 1998 that, effective July 1, 1998, it would begin doing business as Safety-Kleen under the NYSE ticker symbol "SK." On November 25, 1998, LES officially changed its name to Safety-Kleen Corporation.

16.    Laidlaw, Inc. ("Laidlaw") was the majority stockholder of LES until the Safety-Kleen Acquisition. Following the Safety-Kleen Acquisition, Laidlaw continued to own more than one-third of Safety-Kleen's outstanding common stock, and held a debenture which enabled it to increase that ownership to 48%.

-5-

17.    LES, Inc. was the issuer of the 2008 Bonds. At the time of that issuance, LES, Inc. was a wholly owned subsidiary of LES. LES, Inc. later became known as Safety-Kleen Services, Inc., and was a wholly owned subsidiary of Safety-Kleen. LES, Inc. and Safety-Kleen Services, Inc. are collectively referred to herein as "Services." Services was the principal operating subsidiary of Safety-Kleen. Services, like Safety-Kleen, filed for bankruptcy reorganization under Chapter 11 of the Bankruptcy Code in June 2000.

**Defendants**

18.    Defendant PricewaterhouseCoopers LLP ("PwC"), which was formerly known as Coopers & Lybrand LLP ("Coopers"), is an accounting firm that at all relevant times provided accounting services to Safety-Kleen, LES and Services. PwC audited the consolidated financial statements of LES and Safety-Kleen for the fiscal years ended August 31, 1997, 1998 and 1999; issued unqualified opinions that those financial statements fairly presented the Company's financial condition in accordance with generally accepted accounting principles ("GAAP"); and represented that its audits had been conducted in accordance with generally accepted auditing standards ("GAAS"). PwC also reviewed the Company's draft quarterly financial statements before their issuance, to ensure their compliance with GAAP and with SEC rules and regulations. These financial statements were incorporated into and made a part of the Company's public filings, offering memoranda and registration statements with the knowledge and express consent of PwC. PwC was specifically engaged to perform accounting services in connection with the Company's Bond offerings, including review of the Company's registration statements and offering memoranda and the provision of comfort letters to the underwriters. PwC was also, at relevant times, the "independent" auditor for Laidlaw and TD Securities (USA) Inc.

-6-

19.    Defendant James R. Bullock ("Bullock") was the Chairman of the Board and a Director of LES from May 1997 through the date of the Safety-Kleen Acquisition, and held those same positions with Safety-Kleen from the time of the Safety-Kleen Acquisition until he resigned from those positions on or about January 25, 2000.  Bullock was also a Director and Chief Executive Officer of Laidlaw through December 1999, and during that time he was in frequent and close communication with Safety-Kleen's Chief Executive Officer, Kenneth Winger.  Bullock signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

20.    Defendant Leslie W. Haworth ("Haworth") served as a Director of LES from May 1997 until the Safety-Kleen Acquisition, and as a Director of Safety-Kleen at all relevant times after the Safety-Kleen Acquisition.  Haworth was also the Chief Financial Officer of Laidlaw for over 25 years (including during the time period relevant to this cas), and he kept in close contact with the Chief Financial Officer of Safety-Kleen, Paul Humphreys.  Haworth served as the Chairman of the Audit Committee of the Board of Safety-Kleen until March 23, 1999, when he stepped down because he did not satisfy the New York Stock Exchange's criteria for independence.  However, he continued to attend and actively participate in Audit Committee meetings through the end of 1999, essentially playing the same role as before but without the ability to vote.  Haworth signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

21.    Defendant Henry B. Tippie ("Tippie") served as a Director of LES from May 1997 until the Safety-Kleen Acquisition, and as a Director of Safety-Kleen at all relevant times after the Safety-Kleen Acquisition.  In March 1999, Tippie became the Chairman of the Audit Committee

-7-

of the Board of Safety-Kleen. Tippie signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

22.     Defendant James L. Wareham ("Wareham") served as a Director of LES from June 1997 until the Safety-Kleen Acquisition, and as a Director of Safety-Kleen at all relevant times after the Safety-Kleen Acquisition. Wareham was a member of the Audit Committee of the Board of Safety-Kleen at all relevant times. Wareham signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

23.     Defendant Kenneth W. Winger ("Winger") was President, Chief Executive Officer and a Director of LES from May 1997 until the Safety-Kleen Acquisition, and held those same positions at Safety-Kleen from the time of the Safety-Kleen Acquisition until his resignation on or about May 12, 2000. Winger also served as President, Chief Executive Officer and a Director of Services. Prior to his resignation, Winger had been placed on administrative leave by the Board on March 6, 2000. Winger made many of the false and misleading statements alleged herein, and signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

24.     Defendant Paul R. Humphreys ("Humphreys") was Senior Vice President of Finance and Chief Financial Officer of LES from May 1997 until the Safety-Kleen Acquisition, and held those same positions at Safety-Kleen from the time of the Safety-Kleen Acquisition until his resignation on or about May 12, 2000. Humphreys also served as Senior Vice President of Finance and Chief Financial Officer of Services. He had previously served as Manager of Finance for Laidlaw for more than five years. Though not a director of the Company, Humphreys attended and played a prominent role in virtually all Board meetings. Prior to his resignation, Humphreys

-8-

had been placed on administrative leave by the Board on March 6, 2000. Humphreys made many of the false and misleading statements alleged herein, and signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

25.     Defendant Michael J. Bragagnolo ("Bragagnolo") was Executive Vice President and Chief Operating Officer of LES from May 1997 until the Safety-Kleen Acquisition, and held those same positions at Safety-Kleen from the time of the Safety-Kleen Acquisition until his resignation on or about May 12, 2000. As Chief Operating Officer, Bragagnolo was responsible for all of the revenue-generating field operations of the Company, and was fully familiar with the financial results of those operations. Bragagnolo also served as Executive Vice President and Chief Operating Officer of Services. Prior to his resignation, Bragagnolo had been placed on administrative leave by the Board on March 6, 2000.

26.     The Defendants listed in paragraphs 19 through 25 are referred to collectively herein as the "Individual Defendants." By virtue of their positions as senior executive officers of the Company and/or as members of the Company's Board of Directors, the Individual Defendants had access to non-public information about the Company's operations, markets, finances, financial condition, and present and future business prospects. The Individual Defendants had access to such information via: access to internal corporate documents; conversations and connections with other corporate officers and employees; attendance at meetings of management, the Board of Directors, and committees thereof; and reports presented to management and/or the Board of Directors or Board committees.

27.     Defendant TD Securities (USA) Inc. ("TD Securities") is an investment bank, incorporated under the laws of the State of Delaware, that at all relevant times provided financial

advisory and underwriting services to Safety-Kleen and LES. TD Securities was a lead

underwriter for both the 2008 Bonds and the 2009 Bonds, and a lead arranger and syndication

agent on the Company's and Services' credit facilities. An affiliate of TD Securities was also a

lender under those credit facilities. TD Securities was heavily involved in marketing derivative

transaction to the Company from 1998 through early 2000, and one of its affiliates was a

counterparty to the Company on numerous derivative transactions. In addition, TD Securities'

securities analysts published research reports regarding the Company and the Bonds.

## THE ACQUISITIONS FORMING SAFETY-KLEEN

28.   Prior to May 1997, Laidlaw Environmental Services ("Old LES") was a wholly

owned subsidiary of Laidlaw which was engaged in the hazardous and industrial waste business.

Defendants Bullock and Haworth, as the Chief Executive Officer and Chief Financial Officer of

Laidlaw, were responsible for the operations and financial reporting of Old LES, which

constituted one of Laidlaw's three core businesses. PwC's predecessor, Coopers, served as the

outside auditor for Laidlaw and Old LES, and Bullock and Haworth were two of the primary

contacts between Coopers and Laidlaw/Old LES. Coopers found the accounting practices of Old

LES, which were approved by Laidlaw, to be aggressive during this time period.

29.   In May 1997, Old LES was acquired by Rollins Environmental Services, Inc.

("Rollins"), the largest commercial hazardous waste incineration company in North America.

Upon consummation of the Rollins Acquisition, which was accounted for as a reverse acquisition,

Rollins changed its name to Laidlaw Environmental Services, Inc. To finance the Rollins

Acquisition, LES: (i) issued 120 million shares of LES Common Stock, (ii) issued a $350.0

million 5% subordinated convertible pay-in-kind debenture (the "PIK Debenture") and (iii) paid

-10-

$349.1 million in cash to Laidlaw. LES issued a $60 million promissory note (the "Promissory Note") to an affiliate of TD Securities in order to raise the cash necessary to complete the transaction. The Promissory Note was guaranteed by Laidlaw.

30.     Following the Rollins Acquisition, Laidlaw owned 67% of LES, and LES revenue represented 20% of Laidlaw's revenues. By virtue of its 67% ownership, Laidlaw continued to control LES.

31.     Pursuant to the merger agreement with Rollins, Laidlaw was entitled to designate three members of the LES Board. As Chief Executive Officer of Laidlaw, Bullock exercised that power and selected himself, Haworth, and John Grainger (another senior Laidlaw executive). Defendant Winger, whom Bullock had appointed President of Old LES and who continued as President of LES following the Rollins Acquisition, also sat on the LES Board. The other six members of the LES Board included Tippie and two others appointed by Rollins, and Wareham and two others whom Bullock selected and Rollins approved.

32.     In April 1998, LES (through Services) acquired by means of a tender offer approximately 94% of the common stock of Old Safety-Kleen, followed by a short-form merger in May 1998, in which the remaining outstanding shares of Old Safety-Kleen were acquired by Services (together, the "Safety-Kleen Acquisition").

33.     The aggregate consideration paid by LES and Services in the Safety-Kleen Acquisition was approximately $1.1 billion in cash and the issuance of approximately 168 million shares of common stock of LES. At approximately the same time, Services also repurchased substantially all of Old Safety-Kleen's outstanding $100.0 million 9-1/4% notes due September 15, 1999 (the "Debt Repurchase").

-11-

34.     LES and Services financed the cash portion of the Safety-Kleen Acquisition and the Debt Repurchase and refinanced certain indebtedness with total borrowings of approximately $1.8 billion under Services' senior secured bank facility (the "Senior Credit Facility") with Toronto Dominion Bank (an affiliate of TD Securities) and a syndicate of banks, which was consummated pursuant to a credit agreement dated April 3, 1998. LES unconditionally guaranteed payment of Services' indebtedness under the Senior Credit Facility.

35.     Following the Old Safety-Kleen Acquisition, Laidlaw owned 35% of the Company's outstanding stock, as well as the PIK debenture which Laidlaw could redeem and increase its ownership to approximately 48%. Although less than a majority, Laidlaw's block of stock following the Old Safety-Kleen Acquisition gave it effective control over the election of directors to the Company's Board. Bullock decided how Laidlaw would vote its stock. Following the Old Safety-Kleen Acquisition, the composition of the Board did not change, except for the March 1999 replacement of Mr. Grainger with another individual selected by Bullock, Robert Luba. Defendants Bullock, Haworth, Tippie, Wareham, and Winger continued to serve as directors of the Company at all relevant times.

36.     The members of the Company's senior management team were former Laidlaw employees who had been selected when the Company was a wholly-owned subsidiary of Laidlaw, managed by Bullock and Haworth. Bullock appointed Winger as president of Old LES in 1995, and until the Rollins Acquisition, Winger reported directly to Bullock. With input from Haworth, Bullock recommended that the Company's Board hire Humphreys, who was Haworth's protege from Laidlaw, as the Chief Financial Officer. Bullock also recommended Bragagnolo, another former Laidlaw employee, for the position of Chief Operating Officer.

-12-

## THE COMPANY'S IMPROPER ACCOUNTING PRACTICES

37.     Beginning in at least 1997, the defendants caused LES to artificially inflate its reported revenue and income by a wide variety of improper practices.  As a result, LES and later Safety-Kleen reported their financial results in a manner not in conformity with GAAP.

38.     The following are some of the improper practices that defendants employed:

**Accounting for Derivatives**

39.     The Company's financial statements contained improper accounting for interest rate derivative contracts, and failed to disclose the true nature of those contracts.  Its financial statements for fiscal 1998 and fiscal 1999 stated that Safety-Kleen "uses interest rate swap agreements to minimize the impact of interest rate fluctuations on floating interest rate long-term borrowings" and further stated that "[t]he differential paid or received on interest rate swap agreements is recognized as an adjustment to interest expense."  These statements are consistent with the terms of the Senior Credit Facility, which required "interest rate protection" satisfactory to Toronto Dominion Bank (an affiliate of TD Securities) in respect to at least 40% of the Company's floating rate debt until at least March 31, 2000, but are not reflective of what was actually being done.

40.     Typically, a borrower obtains interest rate protection by entering into derivative contracts such as interest rate caps, collars, or swaps.  In an interest rate cap, the borrower pays a premium to a counterparty in exchange for the counterparty's agreement to make payments to the borrower in the event interest rates rise above a specified level, with the effect of limiting the borrower's floating interest rate to the specified level.  An interest rate collar consists of a cap and a corresponding floor (a rate below which the borrower's payments will not go); because the

-13-

borrower pays a premium for the cap and receives a premium for the floor, these contracts can be structured so that the premiums cancel out, and the borrower's interest rate is limited to the range between the cap and the floor at no up front cost. An interest rate swap is a contract in which the party seeking interest rate protection agrees to pay fixed rate payments on a hypothetical "notional amount" in exchange for floating rate payments on the same notional amount; if the swap is priced at the market rate, then the fixed payment will be higher than the floating payment at the contract's inception, and no up front payment or premium is involved.

41.     During the relevant time period, GAAP for interest rate derivative contracts that were used as "interest rate protection" – i.e., used to hedge identified interest rate risk to which the company was subject due to floating rate debt – permitted the derivative contracts to be omitted from the balance sheet, with the premiums paid (for a cap) or cash flow differentials paid or received (with respect to a swap) being treated as adjustments to interest expense.

42.     In its audited financial statements for the fiscal year ending August 31, 1998, Safety-Kleen stated that:

> The Company has entered into interest rate swap agreements to alter interest rate exposures. These agreements, with a principal notional amount of $710 million, expire in periods ranging from 0.5 to 30 years, with a weighted average of approximately 7 years. The Company pays fixed rates ranging from 5.16% to 6.17%, and receives floating rates based on U.S. Dollar LIBOR, determined on a quarterly basis of 5.6875% as of August 31, 1998.

> *    *    *    *

> The Company's fair value cost for all interest rate derivative contracts as of August 31, 1998 was approximately $11.1 million. At August 31, 1998, the Company had no plans to terminate these positions prior to maturity.

-14-

43.    In its audited financial statements for the fiscal year ended August 31, 1999,

Safety-Kleen stated that:

> The Company has entered into interest rate swap agreements to alter
> interest rate exposures.  These agreements, with a principal notional
> amount of $1,095 million, expire in periods ranging from 2 to 30
> years, with a weighted average of approximately 10.2 years.  The
> Company pays fixed rates ranging from 5.31% to 6.71%, and
> receives floating rates based on U.S. Dollar LIBOR, determined on
> a quarterly basis of 5.52% as of August 31, 1999.

*    *    *    *

> The Company's fair value cost for all interest rate derivatives
> contracts as of August 31, 1999, was approximately $30.6 million.
> At August 31, 1999, the Company had no plans to terminate these
> positions prior to maturity.

44.    With one notable exception, these disclosures appear to be generally consistent

with a strategy of maintaining interest rate protection on floating rate long-term debt.  The

exception is that it is unusual to have one or more derivative contracts with a 30-year expiration,

where the company is purportedly hedging floating rate debt instruments with a maximum

maturity of eight years, such as the Senior Credit Facility.  The presence of one or more derivative

contracts with such long maturities was a red flag that should have prompted careful scrutiny of

interest rate derivative contracts during the Company's audits for 1998 and 1999.  Such scrutiny

would have revealed that the 30-year swap was speculative and not a legitimate hedge, and that it

had been improperly accounted for.

45.    In fact, in addition to using "plain vanilla" interest rate swap contracts to create the

appearance of "interest rate protection," during fiscal 1998 and fiscal 1999 the Company was

engaged in an extensive program of taking speculative risks on market changes in interest rates in

order to generate cash payments.  The Senior Credit Facility expressly prohibited the Company

-15-

from engaging in speculative derivative transactions, and this program was not disclosed in the Company's periodic financial reports. Moreover, this speculative, cash-generating program was completely inconsistent with Safety-Kleen's disclosures concerning the nature of its use of derivatives (to minimize interest rate risk), its accounting treatment of such swaps, and its compliance with the covenants in the Senior Credit Facility. By the end of fiscal 1999, Safety-Kleen had generated approximately $38 million in cash through its derivatives program.

46.     The Company used numerous methods to generate cash in its interest rate derivative program. These methods included:

(a)     **Selling "Swaptions**." A "swaption" is an option that is settled by entering into a pre-specified interest rate swap transaction. The party which sells the swaption receives a premium, and the buyer receives the option, exercisable by or on a specified date, to enter into the specified swap with the seller. Examples of swaptions written by Safety-Kleen included:

> **Toronto Dominion Bank ("TD Bank") February 1999 Swaptions**. On February 26, 1999, Services received $20,210,000 in premiums from TD Bank (an affiliate of TD Securities) in exchange for four identical swaptions. These swaptions gave TD Bank the option, exercisable on May 30, 2003, to enter into swaps covering a total notional amount of $325 million in which Services would pay a fixed rate of 9.25% and receive floating rate payments of 3-month LIBOR plus 125 basis points from June, 2003 to June, 2008. This transaction was, in essence, a highly speculative bet by Services that 3-month LIBOR would rise to 8% by June, 2003 and remain at or above that level for five years; TD Bank paid over $20 million to take the other side of that bet.
>
> **Citibank November 1998 Swaptions**. In November, 1998, Services sold three swaptions to Citibank. In the first swaption, Services received a premium of $1,033,160, and Citibank received an option, exercisable by August 31, 1999, to enter into a swap covering a notional amount of $50,000,000 in which Services would pay a floating rate of 3-month LIBOR and Citibank would pay a fixed rate of 5.725% from January, 2002 until October, 2028.

This swaption had the effect of potentially exposing Services to floating rate risk for a period of twenty-six years. In the second swaption, Services received a premium of $1,115,910 and Citibank received an option, exercisable by August 31, 1999, to enter into a swap covering a notional amount of $35 million in which Services would pay a floating rate of 3-month LIBOR and Citibank would pay a fixed rate of 5.57% from January, 2002 until October, 2018. This swaption had the effect of potentially exposing Services to floating rate risk for sixteen years. In the third swaption, Services received a premium of $2,209,700 and Citibank received an option, exercisable by June 1, 2002, to enter into a swap covering a notional amount of $100 million, in which Services would pay a fixed rate of 6.0475% and Citibank would pay 3-month LIBOR from June, 2005 to June, 2012.

**Citibank May, 1999 Swaption**. On May 28, 1999, Services received a premium of $1,060,000 for selling Citibank an option, exercisable by June 1, 2000, to enter into a swap covering a notional amount of $100 million in which Services would pay a floating rate of 3-month LIBOR and Citibank would pay a fixed rate of 7% from June, 2000 to June, 2030. The effect of the transaction was to potentially expose Services to floating rate risk for a period of thirty years.

(b)     **Entering into swaps with embedded written options**.  Interest rate swap

contracts can take many forms, ranging from the "plain vanilla" swaps actually disclosed in the

Company's statements to highly leveraged swaps or swaps containing embedded options.

Services entered into numerous swap contracts containing embedded "written" (meaning Services

was the seller and received a premium) options.  Some examples include:

**May, 1999 Citibank Embedded Option Swap**. On May 28, 1999, Services received a premium of $1,220,000 for entering into a swap with Citibank that included an embedded written option. The swap covered a notional amount of $50 million and provided that Services would pay a floating rate of 3-month LIBOR and Citibank would pay a fixed rate of 5.8375% from October, 1999 to July, 2005, provided, however, that no payment would be due from either party on any quarterly payment date on which 3-month LIBOR was less than 7%. In effect, Services had sold an interest rate cap. It was exposed for six years to the risk that LIBOR would rise to or

-17-

above 7%, in which case it would have to pay Citibank the
difference between the fixed rate payment of 5.8375 % and LIBOR
times the $50 million notional amount.

**August, 1999 Citibank Embedded Option Swap.** On August 25,
1999, Services received a premium of $1,670,000 for entering into a
swap covering a notional amount of $125 million in which it would
pay a floating rate of 3-month LIBOR and receive from Citibank
fixed rate payments of 5.1625% from December, 1999 to June,
2003, provided, however, that no payment would be due from either
party on any quarterly payment date on which 3-month LIBOR was
below 8.25%. Again, Services had sold an interest rate cap to
Citibank.

**August 1999 Citibank Extension Option Swap**. On August 25,
1999, Services received a cash premium of $1,351,000 for entering
into a swap covering a notional amount of $85 million in which it
would pay a fixed rate of 6.14% and Citibank would pay a floating
rate of 3-month LIBOR from October, 1999 to October, 2001,
except that Citibank had the option, exercisable by October, 2001,
to extend the duration of the swap to October, 2003. In effect, this
swap carried an embedded swaption.

(c)     **Terminating favorable contracts in exchange for cash settlements**.  Market

changes in interest rates occurring after a swap is in place will cause it to have a positive or

negative value, determined by the discounted present value of cash differential payments over the

life of the swap.  One method that the Company used to generate cash was terminating swaps

having a positive value (to the Company) in exchange for cash payments.  However, this cash

came at a price, as the termination of these swaps caused Safety-Kleen to lose whatever protection

they provided against interest rate fluctuations.  Examples of this method of generating cash

included:

**July 1998 TD Bank 30-Year Swap, Terminated in May 1999**.
On July 2, 1998, the Company executed a swap with TD Bank on a
notional amount of $50 million for a term of thirty years. The terms
of the swap provided for the Company to pay a fixed rate of 5.965%
and receive a floating rate based on LIBOR. The swap's thirty-year

term far exceeded the terms of any of the Company's outstanding debt obligations. Less than a year after its entry, on or about May 14, 1999, the Company terminated the swap earlier in exchange for a cash premium of $2,041,000. There was no legitimate purpose for the Company to enter a 30-year swap, and it did so for the primary purpose of giving itself the ability to terminate the swap at a future date in exchange for cash.

**August 1998 Terminations of First Chicago and Chase Swaps.** On August 7, 1998, the Company terminated a swap with First Chicago Bank on a $50 million notional amount, and received $1,031,000 in cash. Three days later, on August 10, 1998, the Company terminated a swap with Chase, also on a $50 million notional amount, and received $1,084,508 in cash.

**NationsBank Swap Amended May 1999 and Terminated February 2000.** On May 29, 1999, the Company shortened the term of a previously-entered swap from 10 years to 5 years, and received a cash premium of $929,000. Then, on February 1, 2000, the Company terminated the swap entirely in exchange for $3,070,000 in cash.

**February 2000 Bank One Swap Termination**. On February 1, 2000, Services received a payment of $3,041,400 from Bank One for terminating a "plain vanilla" swap.

47.    During the fiscal year ending August 31, 1999, the Company used a combination of the techniques described above to generate cash payments exceeding $35 million (i.e., over ten percent of its operating income). Further, from September 1999 to February 2000, these methods generated at least another $20 million.

48.    As noted above, the Company included the cash generated by its interest rate derivative program in top line revenue. This accounting treatment was not disclosed and was inconsistent with GAAP. First, the Company's speculative derivative activities would not have qualified for hedge accounting; instead, GAAP required the contracts to be carried on the balance sheet at their market value and marked to market periodically with periodic changes in value

being reflected in the income statement. Even if hedge accounting were applicable, GAAP would have required deferral of premiums (on the swaptions and imbedded options) and deferred treatment of gains on swap terminations (such gains would have been accreted as periodic reductions to interest expense over the remaining life of the hedge or the hedged debt, whichever was shorter).

49.    The Company's inclusion of income generated by its interest rate derivatives activities in top line revenue was not only inconsistent with GAAP, but also materially misleading, having the effect of materially inflating revenues and gross margins with no corresponding costs. The undisclosed inclusion of speculative trading gains in top line revenue materially distorted the market's view of the Company's success in its core businesses. In addition, the notes to the Company's audited financial statements created the impression that the Company enjoyed protection from interest rate risk, when in reality its derivatives activities exposed it to substantial undisclosed risk.

50.    In the Restatement, one of the significant accounting irregularities that had to be corrected involved the inappropriate accounting for, and recognition of gain on, derivatives transactions. As the Company explained in the Restatement:

> During the restatement period [fiscal 1997 through fiscal 1999], the Company failed to record on the balance sheet, at fair value, certain derivative transactions that did not qualify for hedge accounting. In addition, the Company received cash to modify certain existing derivative instruments or to enter into new instruments that contained off-market terms. Rather than record this cash as a borrowing, the Company either improperly recognized the cash received as income immediately or improperly credited various balance sheet accounts, which were then improperly used to increase income over a period of time. Finally, the Company did

not properly account for the early termination or modification of
certain derivative contracts.

The Company restated its net income downward by over $49 million for fiscal 1997 through fiscal

1999 as a result of improper accounting for derivatives, including approximately $9 million to

record net mark to market losses on derivatives, and approximately $40 million to correct the

improper recording of cash payments received on derivatives.

51.     During the mid-1990s, substantial attention in the financial press was being

devoted to derivatives, their high-risk nature, and the problems they had caused for many

companies.  For this reason alone, PwC and TD Securities should have, during the course of their

audits and due diligence, thoroughly investigated and reviewed the Company's derivative

transactions and their potential impact upon the Company's financial condition.  Similarly, the

Individual Defendants should have made sure they understood the nature and risks of the

Company's derivative transactions, and the accounting for those transactions, and ensured that

this information was being properly disclosed to investors.  However, none of the Defendants took

these steps.

52.     Many of the Company's derivative contracts were with affiliates of TD Securities.

In addition, TD Securities arranged the Senior Credit Facility, under which an affiliate of TD

Securities was a lender, and which contained a requirement that the Company maintain interest

rate protection on terms satisfactory to the administrative agent, which was yet another TD

Securities affiliate.  Thus, when TD Securities served as lead underwriter for the issuance of the

Bonds, it knew that the Company was engaged in derivative transactions, it knew the nature of

many of the Company's derivative transactions, it should have known the nature of the remainder

of the Company's derivative transactions, and it knew or should have known that the nature of these transactions was being misrepresented in the Company's financial statements and offering memoranda with respect to the Bonds. Even a minimal amount of due diligence by TD Securities' underwriters would have revealed this, since they would not have had to look beyond the information that was already in the possession of their own affiliated entities. However, no one who was involved in the due diligence process for the issuance of the Bonds ever inquired of their colleagues, or any other counterparties, as to the nature or terms of the Company's derivatives. TD Securities either failed to discover the high-risk nature of the Company's derivative transactions, or discovered it but failed to disclose it to investors or potential investors in connection with the offering of the Bonds.

53.    PwC was aware that the Senior Credit Facility required interest rate protection as part of its "Affirmative Covenants," and that it prohibited speculative derivatives as part of its "Negative Covenants." As part of its workplan for its audit of the Company's fiscal 1999 financial statements, Eric Schachner, PwC's Senior manager on the engagement, prepared a "Corporate Treasury Support Tool" which identified various issues relating to the management of interest rate exposure. Among the audit tests suggested in this document were: (1) reviewing swap documentation to ensure that swaps are plain vanilla; (2) performing sensitivity analysis on debt and the swaps to changes in interest rates; (3) confirming the existence of the swap agreements with counterparties and (4) checking the accounting treatment of premiums received or paid. PwC never took any of these steps.

54.    PwC never obtained copies of any of the Company's derivative contracts, nor did it check the accounting treatment the Company applied to them. PwC never sent confirmation

-22-

letters to TD Securities or any other entity with whom the Company had entered into derivative contracts to confirm the existence or terms of these contracts, despite having represented to the Audit Committee that they would do so. Instead, a junior PwC staff accountant simply obtained a list from the Company's management of the Company's derivative contracts, but PwC did nothing to determine if the list was complete or accurate.

55.     PwC determined that all of the Company's derivative transactions were hedging transactions, based solely on assurances from management. However, the list of derivative transactions obtained by PwC showed terms that were inconsistent with contracts done as simple hedges of interest rate exposure. For example, it showed future start dates, contained contracts with both fixed and variable rates, and included contracts with maturities up to 30 years (which was significantly longer than the term of any of the Company's debt).

56.     The Company's booking of cash proceeds from derivative transactions caused dramatic increases in the Company's interest income accounts. These entries were not difficult to detect, since they appeared as large credits to income in accounts that were outside the normal operating groups. For example, one interest income account more than doubled in a single month, jumping from $800,000 in January 1999 to $1.7 million in February 1999. PwC was given documents that reflected this increase, yet PwC never inquired as to the reasons for the increase.

57.     If PwC had conducted its audits in accordance with GAAS, it would have recognized (1) that the Company's policy of accounting for derivative instruments was not in compliance with GAAP and (2) that the Company's notes to its financial statements concerning the derivative instruments were misleading. If PwC had performed adequate substantive tests of the Company's derivative transactions, it would have known about its extensive program of

-23-

generating cash through speculative interest rate derivatives activities, and would have discovered the improper manner in which Safety-Kleen was treating the cash generated in its financial statements.

58.    By issuing unqualified opinions on the Company's financial statements, PwC created the false impression that the Company's accounting for derivatives was in compliance with GAAP, and that PwC had reviewed and was satisfied with the disclosures in the notes to the financial statements, including the notes relating to the Company's derivative transactions. In fact, PwC had no basis for judging the accuracy of those disclosures.

**Landfill Accounting and Environmental Liabilities**

59.    The Company's landfills were divided into "cells," with each cell capable of handling a particular volume of waste. Under GAAP, the Company was required to provide reserves to cover the costs of closing each cell. The Company's environmental engineers calculated the amount of its reserves for closing costs, based in part on the total upfront construction costs of the cells. GAAP requires that closure costs be determined on an individual cell basis and that the costs be amortized over the life of the cell.

60.    Prior to the Rollins Acquisition, PwC (then Coopers) was aware that, instead of complying with GAAP, Laidlaw and Old LES had applied the "pooling" approach to determining closure costs. Under "pooling," the Company calculated the amortization of landfill space based on a weighted average cost of all the landfills that were owned, instead of establishing amortization rates on a cell-by-cell basis. In 1995, Coopers' Canadian affiliate informed Defendant Haworth and Laidlaw that the pooling method was not acceptable. During fiscal 1996, Coopers' Canadian affiliate proposed a $10 million adjustment for Old LES to reverse the

-24-

pooling-related entries. The adjustment was not made, and the $10 million error carried over into fiscal 1997.

61.     Old LES and then LES continued to use the pooling method through fiscal 1997, resulting in lower amortization cost, and higher net income, than should have been recorded under GAAP. By the end of fiscal 1997, there were $15.3 million in cumulative errors due to the improper use of pooling, including $5.3 million from fiscal 1997 itself and $10 million from prior years. PwC initially proposed that the Company correct the entire $15.3 million misstatement in its fiscal 1997 financial statements. Management declined to do so, and PwC identified this issue as a "critical matter" in its fiscal 1997 audit. Ultimately, rather than require the Company to correct the entire $15.3 million in errors in fiscal 1997 as required by GAAP, PwC allowed the Company to implement a "correcting plan" whereby the error could be written off over a ten-year period. This "correcting plan" violated GAAP.

62.     PwC never considered whether it would have made a material difference to the Company's financial statements if the Company had recorded the entire $15.3 million adjustment in fiscal 1997 instead of pursuant to a correcting plan. Moreover, although $5.3 million of the error clearly related to fiscal 1997, PwC did not even require that $5.3 million to be corrected in fiscal 1997. This is in spite of the fact that a $5.3 million adjustment would have affected the income statement by a magnitude of thirty times greater than PwC's $150,000 materiality threshold for income statement adjustments.

63.     Not only did PwC approve an improper "correcting plan," but it then failed to ensure that the Company followed the plan. In fact, the Company did not follow the plan. Instead, the $15.3 million correction was capitalized and written off as part of the net book value

-25-

of the landfills over the life the landfills, which far exceeded ten years. Therefore, the correction of this error had a minimal impact on the Company's net income each year, whereas under GAAP the Company should have taken a $15.3 million reduction in net income in fiscal 1997.

64.     The Company also violated GAAP in its determination of the economic useful lives of its landfills for purposes of amortizing of landfill costs. The economic useful life of a landfill is measured by the estimated amount of waste the landfill can accept, expressed in terms of airspace capacity. Airspace capacity should be measured based on airspace for which the Company presently holds permits, plus airspace for which the Company will probably obtain permits in the future. GAAP requires a company to follow a systematic and rational approach in evaluating the probability of obtaining future permits, so decisions concerning airspace capacity for amortization purposes are consistent from period to period.

65.     The Company had no systematic or rational approach for estimating airspace for which future permits were probable. Instead, the Company included all possible future airspace within the landfill "footprint" when determining the landfill's useful lives. As a result, the Company amortized its landfill costs over excessive and unreasonable periods of time, thereby understating expenses and overstating net income. PwC never independently evaluated the probability of obtaining permits, and instead relied solely on management's undocumented thought process that the Company was likely to get permits.

66.     The Company also failed to create adequate reserves for environmental liabilities. PwC was aware that the Company was subject to strict liability for certain environmental remediation costs, and that it needed to produce accurate estimates of those costs. Under GAAP, environmental remediation liabilities should be recorded when it is probable that the Company is

-26-

responsible for participating in a remediation process and the amount can be reasonably estimated.

The Company accrued for remediation costs for periods of only 5 to 10 years, substantially less

than the period of their responsibility. As a result, the Company understated its costs and

overstated its net income.

67.     The Company also used numerous other improper accounting methods in

accounting for landfills and environmental liabilities. In the Restatement, the Company stated:

> The Company determined that the landfill accounting model used in
> preparing its previously issued financial statements included errors
> relating to (i) estimates of the probable capacities of the Company's
> landfills (also referred to as "airspace") to be used in accounting for
> the costs of those properties, (ii) estimates of landfill final closure
> and post-closure costs, (iii) the misapplication of certain landfill
> amortization and accrual rates, (iv) the improper capitalization
> and/or deferral of certain costs, and (v) other mathematical and
> clerical errors.
>
> The Company also concluded that it had improperly determined and
> recorded accruals for environmental remediation, Superfund
> obligations, and non-landfill closure and post-closure obligations.
> These included errors related to the reconciliation of the Company's
> estimates of these obligations to the amounts included in its
> previously reported financial statements.

68.     The correction of the Company's improper accounting for landfills and

environmental liabilities resulted in a downward restatement of net income for fiscal 1997 through

fiscal 1999 of over $58 million. In addition, the Restatement adjustments in these areas had a

negative impact of more than $94 million for periods prior to fiscal 1997.

-27-

**Improper Revenue Recognition**

69.     In December 1997, the Company sold a subsidiary called ECDC Environmental L.C. ("ECDC") to Allied Waste Industries, Inc. ("Allied Waste").  As part of the sale, the Company was to receive additional amounts (the "Contingent Purchase Price") if certain conditions were met, including cash flow requirements and the awarding of a specific contract to ECDC.  The Company recorded $8 million of the Contingent Purchase Price as revenue in fiscal 1999, and PwC noted in its workpapers that the conditions in the contract were satisfied. However, PwC made no effect to confirm that the conditions had been satisfied.  In fact, the Company never satisfied the conditions necessary to receive the Contingent Purchase Price, and it never received the $8 million it recorded as revenue.  PwC was reckless in failing to discover that this amount was improperly recorded.  This $8 million entry was reversed in the Restatement.

70.     During fiscal 1999, the Company improperly booked $6.3 million in revenue and $3.15 million in expenses twice, thereby overstating net income by over $3 million.  Also in fiscal 1999, the Company recorded $3.5 million in revenue from a sale of property that never closed. PwC was aware of these entries, and that they were in clear violation of GAAP, and PwC recommended correcting adjustments to both management and the Audit Committee. Management and the Audit Committee (with Haworth participating) declined to make the adjustments, yet PwC still issued an unqualified opinion.  These improper entries were reversed in the Restatement.

71.     Safety-Kleen transacted business with the Company's Canadian affiliate, Safety-Kleen Canada.  Typically, inter-company transactions are recorded in separate accounts on the respective entities' books so those transactions can be readily identified and the inter-company

-28-

profit eliminated, as required by GAAP. Safety-Kleen, however, recorded its inter-company transactions in the same accounts as transactions with third parties, and did not eliminate them from inter-company profit, in violation of GAAP.

72.    PwC was aware that a problem existed with intercompany transactions as far back as 1997. During the course of its audit for that year, PwC reported that activity between LES's facilities in Canada and the United States had greatly increased, but that receivables and payables between those facilities were being included in regular trade accounts rather than in intercompany accounts.

73.    The Company also did not use a consistent method of recording revenue from its waste collection and disposal services. Under GAAP, revenue should have been recorded at the time the waste was disposed of. The Company did so for some operations, but for other operations revenue was recorded at the time the waste was collected. This was contrary not only to GAAP, but also to the Company's own description of its revenue recognition practices in the notes to its published financial statements for fiscal 1997 through fiscal 1999, audited by PwC, which stated:

>    Revenue from treatment and disposal operations, primarily landfill and incineration facilities, is recognized when the waste material is disposed of, whether burned, land-filled or treated.

74.    In the Restatement, the Company stated:

>    The Company determined that, for waste collection and disposal activities, revenue should be recognized at the time of disposal of the waste, and for the parts cleaner and related operations, revenue should be recognized over the service interval. During the restatement years, the Company previously recognized revenue at the time of collection for certain operations (including an accrual for the cost to dispose), and at the time of disposal for certain other

-29-

> operations. The Company made adjustments to consistently apply
> the appropriate revenue recognition policy in accordance with
> [GAAP], including the reversal of revenue accrued improperly.

75.     The Restatement adjustments to correct improper revenue recognition had the

effect of decreasing net income by approximately $33 million over the Restatement period. In

addition, the Restatement adjustments in this area had a negative impact of more than $37 million

for periods prior to fiscal 1997.

**Extended Amortization**

76.     As part of its business for the retrieval and clean-up of oil, fluids and chemicals,

the Company placed parts cleaners and other equipment at customers' locations, as well as at the

Company's own treatment centers and landfills. Under GAAP, companies in the waste

management business are required to depreciate the costs of their equipment over their actual

useful lives. GAAP also requires companies to conform their method of calculating depreciation

to industry norms unless there is a compelling reason for different accounting treatment. If such a

compelling reason exists, GAAP requires footnote disclosure to explain such a departure.

77.     During the Restatement period, the useful lives for virtually all of the Company's

long-lived capital assets were extended to upwards of thirty (30) years which grossly exceeded the

economic lives of those assets and which represented a major departure from industry norms. The

effect of the "useful life" extensions was to reduce depreciation and amortization expense which,

in turn, artificially increased reported earnings. No disclosure of this departure from industry

norms, or the reason for such departure, was made.

78.     PwC was well aware of the Company's aggressive accounting practices regarding

depreciation. In its "Business Assurance Client Acceptance Form" for the fiscal 1997 audit, PwC

-30-

stated that "management is very competent and has always been honest with [PwC], although they are often aggressive with accounting matters." During the same audit engagement, PwC prepared a memo which updated certain 1996 issues. In the memo, PwC stated that LES had extended the depreciable lives on virtually all long lived assets, which resulted in 1996 depreciation expense being $1,700,000 less than would have been recognized under the old lives. PwC further noted that the fiscal 1997 depreciation expense had been calculated using the same lives as in 1996. In preparation for the 1998 audit, PwC prepared a "Business Risk Assessment" which also discussed the Company's depreciation practices. In the section entitled "Integrity and Ethics" PwC stated: "[T]he company has historically used aggressive accounting practices related to depreciation and purchase price allocation." Nonetheless, PwC did not challenge or question the extensions of the useful lives by the Company.

**Improper Capitalization of Expenses**

79.     During the Restatement period, the Company's net income was materially overstated as a result of the improper capitalization of costs that should have been recorded as expenses. For example, the Company capitalized the amounts spent on tires and diesel fuel to run the Company's trucks and other equipment, thereby artificially increasing reported income. Those amounts should have been charged as expenses, thereby reducing reported income, under GAAP.

80.     In the Restatement, the Company explained that it had "determined that certain costs and expenses related to software, repair and maintenance, marketing, startup losses, vehicle fuel and tires, inventory and consulting fees were improperly capitalized or deferred." The Restatement adjustments to correct this incorrect capitalization of expenses resulted in a decrease in net income of over $33 million for fiscal 1997 through fiscal 1999.

-31-

**Improper Capitalization of Interest Expense**

81.    During fiscal 1997, the Company capitalized interest on the cost of landfill cells

that were not yet under development.  PwC's engagement partner, Robert Hoppe, considered this

to be "creative" and "aggressive" accounting, and during the fiscal 1997 audit PwC's national

office concluded that it did not comply with GAAP.  However, PwC did not propose an

adjustment, thereby allowing the Company's financial statements to remain misstated.  The

Company persisted in its improper interest capitalization in fiscal 1998.  In the Restatement, the

Company reversed the capitalization of landfill interest expense, reducing income by

approximately $2.5 million for fiscal 1997 and $500,000 for fiscal 1998.

82.    The Company also capitalized interest that it attributed to its initial investment in

Old Safety-Kleen prior to ultimately acquiring its controlling interest.  PwC concluded during its

review of the third quarter fiscal 1998 financial statements that there was no basis under GAAP to

capitalize interest during a holding period prior to an acquisition.  PwC proposed a $925,000

adjustment during the fiscal 1998 audit to reverse the entry, but management and the Audit

Committee declined to make the adjustment.  The full amount was later reversed in the

Restatement.

**Harbor Dredging Operations**

83.    In fiscal 1998 and fiscal 1999, the Company improperly recorded revenues for

contingent claims relating to its harbor dredging business.  These claims sought compensation for

cost overruns on harbor dredging contracts.  GAAP does not permit such claims to be recorded as

revenue unless it is probable that the claim will result in additional revenue and the amount can be

reasonably estimated.  The evidence supporting the claim must be objective and verifiable, not

based on unsupported representations by management. Rather than conduct an analysis of the probability of recovery or the amount that could reasonably be expected, the Company recorded the full amount of its claims, with no reserve.

84.     PwC was aware that these types of claims were typically denied, that they would likely require several years of litigation, and that they would likely be settled for less than the full amount. Because the claims were subject to litigation, GAAS required PwC to confirm their collectibility with counsel. PwC's in-house counsel declined to provide PwC with an opinion on collectibility. PwC was aware that the Company had outside counsel who dealt with its harbor dredging claims, but PwC never contacted that counsel for an opinion regarding the claims. Instead, PwC issued an unqualified opinion despite the inclusion of the full amount of the harbor dredging claims in revenue, based solely on management's assessment that the full balance of the claims was collectible.

85.     In the Restatement, the Company explained the accounting errors relating to harbor dredging as follows:

> In its previously issued financial statements, the Company improperly recorded revenue for governmental contract claims which have not been collected and for other contingent revenues. To a lesser extent, the Company also capitalized certain operating costs, improperly recorded purchase accounting reserves for operating inefficiencies and contingencies and did not appropriately accrue various costs related to its harbor dredging operation.

86.     The Restatement adjustments relating to the harbor dredging operation decreased the Company's reported net income by more than $10 million for fiscal 1998 and by more than $42 million for fiscal 1999.

-33-

**Restructuring Charges**

87.     At the end of the third quarter of fiscal 1998, ended May 31, 1998, the Company

wanted to record a $65 million restructuring charge, purportedly relating to the closure of facilities

and lay-offs of employees.  GAAP requires a company to have a plan that specifically identifies

the facilities to be closed, and the number and type of lay-offs to occur, before such a charge may

be recorded.

88.     When PwC reviewed the proposed charge, it determined that the charge could not

be recorded under GAAP unless the Company identified the facilities to be closed.  PwC

requested a representation letter from management stating that the Company had identified the

facilities as of May 31, 1998, that the closures would commence within the next year, and that no

significant changes in the plan were anticipated.   Management declined to provide the

representation letter.

89.     When no representation letter was provided, PwC determined that the components

of the restructuring charge did not meet the requirements of GAAP.  At that point, the Company's

management agreed to reverse the charge in the quarterly financial statements.  However, that

decision was soon reversed by the Audit Committee.

90.     On July 7, 1998, PwC's engagement partner, Robert Hoppe, informed the Audit

Committee that PwC did not approve of the restructuring charge.  Defendant Tippie, on behalf of

the Audit Committee, informed PwC that the charges would be recorded in the Company's third

quarter financial statements anyway.  PwC's audit team then consulted with PwC's national office,

and it was decided that PwC would not issue a quarterly review report due to the Company's

-34-

insistence on recording unsupported restructuring charges. The Company filed its Form 10-Q for the quarter anyway.

91.     The financial information from the third quarter of 1998 was to be included in the registration statement for the 2008 Bonds. PwC's national office concluded that PwC should not consent to the inclusion of its audit opinion in that registration statement unless the restructuring charge was reversed.

92.     Before the registration statement for the 2008 Bonds was issued, however, the Company came up with a purported need to increase the environmental accruals for the Company's Lexington, South Carolina facility, which was one of the facilities slated to be closed. Conveniently, the increase offset the components of the restructuring charge that PwC had found objectionable. PwC's auditors then consented to the inclusion of their opinion in the registration statement, after doing nothing to confirm or test the "new" accruals except talk to a single Safety-Kleen employee about them. PwC did not apply the level of professional skepticism that was required under GAAS under these circumstances. PwC also either intentionally ignored or recklessly overlooked the fact that the Safety-Kleen employee, Geoff Jones, told them that Safety-Kleen was not responsible for the entire amount which had been presented to PwC, but only for a portion thereof. In fiscal 1999, after the 2008 Bond offering was completed, the Company reduced the accruals for the Lexington, South Carolina facility from $13 million to $2.9 million.

93.     The Company also recorded a restructuring charge in fiscal 1997, in the amount of $331.8 million, purportedly related to the closure of redundant facilities and impairment in certain facility values following the Rollins Acquisition. The restructuring charges for both fiscal 1997 and fiscal 1998 included accruals for severance and exit costs which did not meet the criteria

-35-

under GAAP for inclusion in a restructuring charge. In fact, the restructuring charges included items that constituted operating expenses, asset impairments, and asset write-offs which did not relate to exiting business activities. Classifying these items as restructuring charges gave the false appearance that they were one-time charges as opposed to recurring operational items, thereby creating the impression that operating results were better than they really were.

94.     In the Restatement, the Company stated:

> The Company recorded and classified certain costs and expenses as restructuring and other charges in 1997 and 1998. Included in these amounts were accruals for severance and exit costs as defined in Emerging Issues Task Force ("EITF") 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." The Company has determined it had not committed to restructuring plans which met the requirements of this standard. Accordingly, certain of these charges have been reversed.

> The remaining components of the previously reported restructuring and other charges represent proper costs and expense in the periods previously reported but have been reclassified to other income statement captions, primarily to impairments and other charges ... and to operating expenses.

**Purchase Accounting**

95.     The Company accounted for both the Rollins Acquisition and the Safety-Kleen Acquisition using the purchase method of accounting. Under this method, when two entities are combined into one, the acquiring entity must allocate the cost of the acquisition to tangible and intangible assets at fair value. If the total costs exceeds these tangible and intangible assets, the difference (excess purchase price) is recorded as goodwill.

96.     In the Rollins Acquisition, there was an excess purchase price of approximately $262 million. The Company allocated the entire amount to permits, rather than goodwill. Based

-36-

on cash flow projections prepared by management in fiscal 1997, however, the justifiable permit values totaled only $57 million.

97.    In the Safety-Kleen Acquisition, there was an excess purchase price of approximately $1.7 billion, of which the Company allocated $1.156 billion to permits. That allocation was based on a calculation by Defendant Humphreys that applied the historical experience of LES to Old Safety-Kleen, despite the differences in their lines of business.

98.    As part of its accounting for the Rollins Acquisition and the Safety-Kleen Acquisition, the Company also recorded the assumption of substantial liabilities. The recording of reserves for liabilities in purchase accounting is rife with the potential for abuse. By setting up excessive reserves, sometimes called "cookie jar reserves," a company can give itself the ability to artificially improve future earnings by taking charges against those reserves. The Company established excessive reserves in connection with both of its acquisitions, including but not limited to the following:

> a.    In the Rollins Acquisition, the Company booked a $4.635 million turnaround reserve for future general repair costs. PwC informed management and the Audit Committee that this reserve should not be recorded, but it was recorded anyway, and PwC issued an unqualified opinion. The reserve was reversed in the Restatement.
>
> b.    In the Rollins Acquisition, the Company recorded an $11.6 million litigation reserve which was based on the maximum potential exposure (including legal fees), without regard for the probability of success. PwC noted in its workpapers that this reserve was excessive, and that the total estimated liability was closer to $6 million. In the Restatement, nearly $11 million of this reserve was reversed.
>
> c.    The Company recorded a $17 million severance accrual in the Rollins Acquisition, of which $5.9 million related to severance for employees of LES rather than employees of Rollins, and thus was prohibited by GAAP.

-37-

PwC did nothing to determine whether the accrual included severance being paid to LES employees.

d.   The Company recorded a general reserve of $8.25 million in the Rollins Acquisition that did not relate to a specific facility and thus was prohibited by GAAP.

e.   The Company recorded a general contingency reserve of $10 million in the Safety-Kleen Acquisition that did not relate to a specific liability and thus was prohibited by GAAP.

f.   The Company recorded $22 million in excessive environmental reserves in the Safety-Kleen Acquisition.

g.   The Company recorded accrued severance costs of $29 million in the Safety-Kleen Acquisition purchase accounting. Of that amount $24 million was for "stay-put" bonuses which did not qualify as purchase price adjustments under GAAP. PwC never looked at the documentation regarding these severance costs, and never discovered that it included "stay-put" bonuses.

99.   In the Restatement, the Company described the adjustments related to purchase accounting as follows:

> The Company determined that it had improperly accounted for its acquisitions between September 1, 1996 and August 31, 1999, primarily related to the Rollins Acquisition and the Old Safety-Kleen Acquisition. A substantial portion of these errors were the result of the inappropriate establishment and use of certain reserves in accounting for these acquisitions. Corrections of previously recorded reserves related primarily to estimated liabilities for legal, severance, environmental and future maintenance costs.

> Less significantly there were also errors in the valuation of certain acquired intangible assets and related deferred tax liabilities. These errors primarily consisted of overstatements of values assigned to permits and corresponding understatements of values assigned to goodwill in connection with the Rollins Acquisition in 1997 and the acquisition of Old Safety-Kleen in 1998 ....

100.    The Restatement adjustments to correct the Company's improper purchase accounting reduced the Company's net income by more than $170 million for fiscal 1997 through fiscal 1999 ($17.7 million in fiscal 1997, $85 million in fiscal 1998, and $67.9 million in fiscal 1999).

**Fictitious Revenue Entries and Adjustments**

101.    In connection with the Rollins Acquisition, the Company established an account entitled "Account 2050 - Accounts Payable - Other" to record environmental liabilities established in purchase accounting.  The Company soon (in fiscal 1997) began using this account to record more than environmental liabilities, and by the end of fiscal 1999, thousands of unsupported entries had been made in this account, many of them in large, round dollar amounts.  These were strictly paper entries for which no money was ever exchanged, and for which there was no supporting documentation.  Virtually all of them had the effect of artificially increasing revenue or income.

102.    In auditing the 2050 account, PwC reviewed sub-accounts and made inquiries of management.  No one denied PwC access to the books reflecting entries into this account.  Yet, PwC never detected the unsupported entries in this account.

103.    Also during this period, numerous accounting adjustments were recorded on the Company's books at the very end of a quarter.  Like the journal entries for fictitious transactions, many of these adjustments lacked any factual justification, were not supported by competent evidential matter, and had the effect of artificially inflating the Company's financial results.

-39-

104.     Virtually all of the fictitious journal entries and quarter-end adjustments were made at the corporate level – either by Winger or Humphreys personally, or by other Safety-Kleen personnel at their express direction – in the Company's Columbia, South Carolina offices.

105.     The Company's finance staff generated multiple "runs" of the Company's financial statements each month and quarter, each reflecting progressively more corporate-level adjustments which had the effect of improving earnings.  There were upwards of ten runs each accounting period, and the changes from one run to the next were material.  For example, for the month of May 1999, the ninth run reported earnings before interest, taxes, depreciation and amortization ("EBITDA") of $16.7 million, whereas the "final" run showed EBITDA of $84.5 million after numerous corporate-level adjustments were made.  In at least some quarters, the financial results were adjusted even further upwards from the "final" run before the financial statements were published.

106.     Defendants Winger, Humphreys, Bragagnolo and Haworth received copies of the preliminary runs.  Haworth admitted during a March 2000 Board meeting that he had routinely received as many as eighteen "flash reports" per quarter, reflecting corporate-level adjustments.  The preliminary runs were discussed during monthly operational meetings attended by, among others, Winger, Humphreys and Bragagnolo.  The preliminary runs were also available to PwC, TD, and the Audit Committee, had they requested such information.

107.     In July 1999, there were so many fictitious and unsupported entries in the Company's books that the Company's accounting department undertook to reverse all of those entries, so "uncooked" financial statements could be "given to the guys upstairs" to show them what the Company's real financial results were.  Then, in August 1999, those adjustments were

-40-

booked yet again, so as to return the books to their prior "cooked" condition. Defendants

Humphreys, Winger and Bragagnolo received this information, which showed that the Company's

"true" EBITDA was more than $100 million less on a cumulative basis than what they were

representing to the public.

## Other Asset and Liability Adjustments

108.    In the Restatement, the Company also reported that numerous additional

adjustments were required to correct improper accounting for assets and liabilities:

> During the restatement period, the Company failed to record
> adjustments necessary to reconcile cash, inventories and property,
> plant and equipment to supporting records and/or physical counts.
> The Company also improperly recorded amortization of permits and
> deferred losses related to disposals of property, plant and
> equipment. In addition, the Company recorded inappropriate
> receivables related to unearned interest and finance charges on
> accounts and notes receivable and provided inadequate allowances
> for doubtful accounts. Additionally, the Company inappropriately
> capitalized various expenses as prepaid or deferred costs and failed
> to approximately recognize equity in earnings related to investments
> in affiliates. Finally, adjustments for certain asset impairments
> resulting from the Company's decisions to sell, close or alter the use
> of various facilities were not appropriately recorded in its previously
> issued financial statements.

*        *        *

> The Company determined that during the restatement period, it had
> inappropriately reversed or recorded charges against certain
> liabilities or inadequately provided for various accrued liabilities,
> including vacation, medical costs, legal actions against the
> Company, incentive programs and sales commissions.

109.    The Restatement adjustments related to these asset and liability adjustments

resulted in a $168 million decline in net income for fiscal 1997 through fiscal 1999 ($23 million

in fiscal 1999, $64 million in fiscal 1998, and $81 million in fiscal 1999).

**The Systems Conversion**

110.    Beginning immediately after the Safety-Kleen Acquisition, the new management of Safety-Kleen (including defendants who were former members of LES management) directed that Old Safety-Kleen's accounting and information systems be scrapped and replaced by LES's former systems, even though LES was less than half the size of Old Safety-Kleen and its systems were ill-equipped to meet the combined entities' needs. This fact, together with the fact that Old Safety-Kleen's experienced accounting personnel were terminated after the Safety-Kleen Acquisition, resulted in Safety-Kleen failing to meet its weekly payroll four times during the Summer of 1998 because it could not process paychecks.

111.    After the Safety-Kleen Acquisition, the defendants forced Old Safety-Kleen to convert its accounting systems, which handled 500,000 customers and 5 million transactions per year, to LES's accounting system (PeopleSoft). The LES system was not equipped to handle the volume of transactions that the combined LES/Safety-Kleen entity would generate.

112.    During and after the PeopleSoft conversion, Safety-Kleen had a materially significant problem with accounts receivable because the new system could not tell which customers had paid their invoices. In one Illinois branch, there were about $2 million worth of invoices that had been paid but could not be reconciled to specific customers. Safety-Kleen blindly deposited the checks and kept billing its customers. When customers complained, Safety-Kleen management directed branch personnel to tell their customers as little as possible and state that it was an isolated incident, even though the branch personnel knew otherwise.

113.    By August 1999, the Company had approximately $45 million in cash that had been received as payments from customers, but that it was unable to apply against individual

-42-

accounts due the system conversion problems. In addition, the Company had suspended all of its collection efforts as of the end of fiscal 1999. Yet, no disclosure of these system integration problems was made in the fiscal 1999 financial statements. To the contrary, the Company continued to represent that its integration following the Safety-Kleen Acquisition was proceeding smoothly.

114.    As a result of Safety-Kleen's system conversion problems, the Company's reported financial results for fiscal 1998 and fiscal 1999 were materially misstated. For example, the Company's reported accounts receivable and revenues were overstated, since revenue was being recorded as customer payments were received, but accounts receivable were not being taken off the books since the Company could not match payments with particular receivables.

## MATERIAL MISSTATEMENTS AND OMISSIONS IN CONNECTION WITH ISSUANCE AND SALE OF THE BONDS

115.    As a result of all of the foregoing accounting violations and issues, among others, the financial statements of LES and Safety-Kleen were materially misstated during fiscal 1997, fiscal 1998, fiscal 1999, and the first quarter of fiscal 2000. In particular, the Company's earnings, revenue and income figures were materially overstated.

116.    The fiscal 1997, 1998 and 1999 audited financial statements and accompanying audit opinions have been withdrawn by Safety-Kleen and PwC, respectively, because those entities admit they contained material inaccuracies and should not be relied upon. PwC's engagement partner for the Company's audits, Robert Hoppe, has admitted under oath that the Company's fiscal 1997, 1998 and 1999 audited financial statements were false. Tippie and Wareham have also testified under oath that these financial statements, the Registration

-43-

Statements and Forms 10-K which they signed, as well as PwC's audit opinions therein, were materially false and misleading.

117.    In addition to the financial statements of LES and Safety-Kleen and the audit opinions of PwC, a number of other statements made by Defendants regarding the Company's financial condition were materially false and misleading due, in substantial part, to the accounting practices and materially misstated financial results discussed herein.

118.    These false and misleading financial statements infected the entire process by which Defendants issued the Bonds, as well as the secondary market for the Bonds. As the Defendants knew and understood, the ability of Safety-Kleen and LES to service their debt was of paramount importance to prospective purchasers of the Bonds. In marketing the Bonds, the Defendants highlighted pro forma EBITDA and adjusted EBITDA calculations. These figures were materially false and misleading because they incorporated the misleading historical data.

119.    In addition to providing false and misleading financial information relating to the Company, the Defendants marketed the Bonds without disclosing material facts. These omissions lulled investors into a false sense of the reliability of the information upon which they based their decision to buy the Bonds. For example, none of the Defendants disclosed that the Company was engaged in high-risk derivative transactions, or that the Company was engaged in numerous aggressive and unsupported accounting practices which adversely affected the reliability of the Company's financial statements. To the contrary, the Company's financial statements – on which PwC issued unqualified opinions – falsely stated that the Company's derivative contracts were reducing its interest rate risk, that the gains or losses on those contracts were being accounted for

-44-

as adjustments to interest expense (as GAAP required), and that the financial statements were otherwise presented in accordance with GAAP.

120.    As the Company's independent auditors, PwC was responsible for reviewing the Company's accounting practices and providing an opinion as to whether those practices comply with GAAP. In conducting its audits, PwC intentionally or recklessly failed to recognize and/or report the misrepresentations and omissions in the Company' financial statements, and issued unqualified audit opinions on the financial statements of the Company for the fiscal years ended August 1997, 1998 and 1999, falsely certifying their compliance with GAAP.

121.    TD Securities likewise was responsible, as a lead underwriter for the issuance of the 2008 and 2009 Bonds, for conducting due diligence regarding the Company and its financial condition, and for ensuring the accuracy and completeness of the Company's Offering Memoranda and Registration Statements. If TD Securities had not been reckless when conducting due diligence in connection with the offerings of the Bonds, it would have known about the Company's system conversion problems and the accounting manipulations alleged herein, it would also have detected the material misstatements in the Company's financials, and it would have ensured that the true facts were disclosed to investors. TD Securities should have detected these misstatements, since it and its affiliates: (a) were lenders to the Company and Services, (b) served as the Company's and Services' primary bank, and (c) participated in and had direct knowledge of the Company's derivative transactions. TD Securities either did not detect the misstatements, or detected them but failed to disclose that information. TD Securities led investors to believe that adequate due diligence had been performed in connection with the issuance of the Bonds, when in fact it had not.

-45-

## LES (THROUGH SERVICES) ISSUES THE 2008 BONDS

122.    LES and Services financed the cash portion of the Safety-Kleen Acquisition, in part, through the sale of $325 million of the 2008 Bonds.

123.    The 2008 Bonds were issued in the same manner as most high yield debt. The issuance involved two steps. The first step was to issue the 2008 Bonds through underwriters pursuant to an Offering Memorandum. The second step was to exchange the bonds issued in the first step for identical bonds issued pursuant to a Registration Statement. As is the case with all high yield debt issued in such two-step offerings, the 2008 Bonds were priced from the outset as registered, freely tradeable securities.

124.    The 1998 Offering Memorandum was created by Services, LES, the Individual Defendants, and TD Securities, and was disseminated to investors and investment managers, including TCW, in the spring of 1998. TD Securities was a lead underwriter for the 2008 Bonds. As such, it initially purchased the 2008 Bonds and immediately resold them to investors in the first step of the transaction. TD Securities was compensated for its services by a discount between the price at which it initially purchased the 2008 Bonds from the issuer and the offering price. This difference of 2.5% (*i.e.*, TD Securities' fee) was the industry standard for underwriters of public offerings.

125.    The 1998 Offering Memorandum was used by Services, LES, the Individual Defendants and TD Securities to solicit investors not only to participate in the first step of the offering, but also to participate in the second step exchange by which the 2008 Bonds achieved their status as registered, freely tradeable securities. The two steps of the offering were

-46-

inseparable, and each and every communication soliciting the participation of any person in the

first step necessarily also solicited participation in the second step.

126.    Defendant PwC reviewed the 1998 Offering Memorandum prior to its issuance,

and provided "comfort letters" to TD Securities regarding the financial information contained

therein. With PwC's consent, its unqualified audit opinion on the LES fiscal 1997 financial

statements was included in the 1998 Offering Memorandum, stating:

> We have audited the accompanying balance sheets of [LES]
> and Subsidiaries, as of August 31, 1997 and 1996, and the related
> consolidated statements of income, cash flows, and changes in
> stockholders' equity for each of the three years in the period ended
> August 31, 1997....
>
> We conducted our audit in accordance with generally
> accepted auditing standards. These standards require that we plan
> and perform the audit to obtain reasonable assurance about whether
> the financial statements are free of material misstatement. An audit
> includes examining, on a test basis, evidence supporting the
> amounts and disclosures in the financial statements. An audit also
> includes assessing the accounting primicples used and significant
> estimates made by management, as well as evaluating the overall
> financial statement presentation. We believe that our audit provides
> a reasonable basis for our opinion.
>
> In our opinion, the accompanying consolidated financial
> statements referred to above present fairly, in all material respects,
> the consolidated financial position of [LES] and Subsidiaries as of
> August 31, 1997 and 1996, and the consolidated results of their
> operations and their cash flows for each of the three years in the
> period ended August 31, 1997, in accordance with generally
> accepted accounting principles.

127.    The proceeds of the sale of the 2008 Bonds were to be used to repay a portion of

the Senior Credit Facility that had been obtained to help finance the Safety-Kleen Acquisition. As

a result, the 1998 Offering Memorandum highlighted the benefits of the Safety-Kleen Acquisition

-47-

in order to induce purchases of the 2008 Bonds.  To give investors comfort that the Company was

capable of achieving those benefits, the Offering Memorandum also proclaimed success in

achieving cost savings benefits in the Rollins Acquisition.

128.    The 1998 Offering Memorandum explained:

> ... The Rollins Acquisition combined the Company's full-service
> collection and treatment network with Rollins' expertise in solids
> incineration technology and provided significant savings from
> facility and administrative rationalizations.  The Company believes
> the Safety-Kleen Acquisition combines complementary assets that
> enhance the Company's competitive position and provide
> opportunities for significant cost savings from synergies related to
> facility consolidation, waste internalization and selling, general and
> administrative cost savings.

*          *          *

> *Synergies.*  The Company intends to build upon Safety-
> Kleen's leading market presence and quality brand name
> recognition.  The Company believes that the Safety-Kleen
> Acquisition provides an opportunity to achieve significant cost
> savings through the elimination of existing redundancies between
> the Company's and Safety-Kleen's operations.  The Company
> expects that the planned selling, general and administrative cost
> savings, the closure of duplicative collection and processing
> facilities, the increased utilization of the remaining facilities and the
> internalization of various waste streams will generate annual cost
> savings of approximately $103.5 million to $165.0 million.  The
> Company expects to begin achieving cost savings within three
> months of the Safety-Kleen Acquisition, and to fully realize these
> cost savings within twelve months after consummation of the
> Safety-Kleen Acquisition.  Through the Rollins Acquisition, the
> Company has demonstrated its ability to manage the integration of a
> large acquisition and to realize substantial cost savings.  To date, the
> Company believes that it has generated approximately $75.0 million
> of annualized cost savings in connection with the Rollins
> Acquisition.  There can be no assurance, however, that the projected
> cost savings from the Safety-Kleen Acquisition will be achieved.

-48-

3:05-cv-00560-JFA    Date Filed 02/23/05    Entry Number 1    Page 49 of 49

129.    The fiscal 1997 annual financial statements of LES, as audited by PwC, were contained within the 1998 Offering Memorandum. Those financial statements were materially false and misleading as a result of the improper accounting practices and fraudulent schemes alleged herein.

130.    The 1998 Offering Memorandum provided historical and selected consolidated financial data for LES and its subsidiaries, including revenues of $511,554,000, $517,804,000, $599,241,000, $652,973,000 and $678,619,000 for the fiscal years ending August 31, 1993, 1994, 1995, 1996 and 1997, respectively. The 1998 Offering Memorandum also reported cash flow for LES, reporting EBITDA of $93,904,000, $108,245,000, $105,610,000 and $120,489,000 for the 1994-1997 fiscal years, respectively. The 1998 Offering Memorandum explained that these EBITDA figures represented operating income plus depreciation and amortization (minus a non-recurring restructuring charge) and that EBITDA "provides useful information regarding the Company's ability to service debt." All of these financial results for LES were derived from LES's consolidated financial statements as audited by Coopers (now PwC), represented to be LES's "independent auditors."

131.    The 1998 Offering Memorandum also provided *pro forma* combined financial data, giving effect to the Safety-Kleen Acquisition and the Rollins Acquisition and related transactions as if they occurred on September 1, 1996. For the fiscal year ended August 31, 1997, the 1998 Offering Memorandum reported *pro forma* EBITDA of $295,262,000 and *pro forma* Adjusted EBITDA of $495,262,000. For the twelve month period ended February 28, 1998, the 1998 Offering Memorandum reported *pro forma* EBITDA of $329,980,000 and *pro forma*

-49-