Adjusted EBITDA of $497,480,000. EBITDA was again represented as providing "useful

information regarding the Company's ability to service debt."

132.    The Adjusted EBITDA was provided to project the financial performance of the

Company after certain cost savings were achieved in the Safety-Kleen Acquisition and the Rollins

Acquisition. The 1998 Offering Memorandum provided that:

> Adjusted EBITDA represents EBITDA plus (i) $130.0 million of
> annual cost savings (or $65.0 million for the six months ended
> February 28, 1998) that the Company expects to realize in
> connection with the Safety-Kleen Acquisition... and (ii) $70.0
> million, $5.0 million and $37.5 million in fiscal 1997 and the six
> and twelve months ended February 28, 1998, respectively, of
> potential cost savings not yet realized in connection with the Rollins
> Acquisition. . . . To date, the Company believes it has generated
> $75.0 million in annualized cost savings from the Rollins
> Acquisition based on estimated realized cost-savings from the
> Rollins Acquisition of $5.0 million, $32.5 million, and $37.5
> million in fiscal 1997, the six and twelve months ended February
> 28, 1998, respectively.

133.    The foregoing statements in the 1998 Offering Memorandum were materially false

and misleading, because the Company had not realized $75 million in annualized cost savings as a

result of the Rollins Acquisition, and because the Company's improper accounting practices

rendered its historical financial results -- upon which the projections as to future cost savings, *pro

forma* revenues and Adjusted EBITDA were based -- inaccurate.

134.    The 1998 Offering Memorandum also stated that "[t]he Company uses interest rate

swap agreements to minimize the impact of interest rate fluctuations on floating interest rate long-

term borrowings," and that "[t]he differential paid or received on interest rate swap agreements is

recognized as an adjustment to interest expense." These representations were materially false and

misleading, because the Company's interest rate swap agreements were actually increasing, rather

than reducing, the risk to the Company of interest rate fluctuations, and because the premiums the Company had been receiving on these derivative contracts were being recorded as revenue rather than as adjustments to interest expense.

135.    TCW read and relied on the 1998 Offering Memorandum, including the financial information therein and the statements regarding the achievement of synergies and the nature of the Company's derivatives transactions, in connection with its purchases of 2008 Bonds on behalf of Plaintiff.

136.    The financial results and audit opinion in the 1998 Offering Memorandum were materially false and misleading as a result of the improper accounting practices alleged herein, as well as other improper accounting practices uncovered by the Company during its internal investigation and restatement process.

137.    In a further effort to drum up interest for the 2008 Bonds, Defendants Winger and Humphreys, together with lead investment banker TD Securities, led a nationwide road show during the spring of 1998 (the "LES Road Show"). The LES Road Show made a stop in Southern California, where it visited TCW.

138.    In May 1998, as part of the LES Road Show, LES presented a slide show and written materials to TCW in an effort to solicit interest in purchasing the 2008 Bonds. Those materials were created by TD Securities, based upon information provided by the Company's management. They reiterated the 1998 Offering Memorandum's *pro forma* revenue and Adjusted EBITDA figures of $1.8 billion and $498 million, respectively, as well as the anticipated synergistic cost savings of between $104 million and $165 million for the first twelve months. These materials further reported that LES had already exceeded its projected costs savings as a

result of the Rollins acquisition. In addition, these presentation materials repeated the historical LES revenue and EBITDA figures for 1994, 1995, 1996 and 1997, as well as the *pro forma* EBITDA figures, that had been included in the 1998 Offering Memorandum. These statements were materially false and misleading for the same reasons as the statements in the 1998 Offering Memorandum.

139.    One or more representatives of TD Securities were present for every stop on the LES Road Show. They described the offering to investors, and then introduced defendants Winger and Humphreys, who gave oral presentations including false statements about the Company's financial situation and the liberal use of the financial statements that would later be withdrawn and restated. The TD Securities representative(s) listened to these false statements and did nothing to correct them, thereby leading TCW to believe that TD Securities, after conducting due diligence, stood behind the accuracy of those statements.

140.    At the conclusion of the LES Road Show, TD Securities engaged in "price talk" with investors to determine the appropriate pricing for the Bonds. Initially, the Company had planned to offer $300 million par amount of the 2008 Bonds. However, because of the high level of interest that was generated in the offering, it was oversubscribed and the Company increased the offering to $325 million.

141.    In reliance on the information received during the LES Road Show, and the information contained in the 1998 Offering Memorandum, including the false financial statements that would later be withdrawn and restated, TCW purchased 2008 Bonds in the initial offering on behalf of Plaintiff.

-52-

## THE DEFENDANTS CONTINUE TO PUMP
## FALSE INFORMATION INTO THE MARKET

142.    On June 24, 1998, the Company and Services filed a Form S-4 Registration

Statement with the SEC with respect to the 2008 Bonds, containing substantially similar

information to the 1998 Offering Memorandum.  For example, in language identical to that in the

1998 Offering Memorandum, the Form S-4 explained the Company's Business Strategy and the

"synergies" that would be achieved by combining the two companies.  It also repeated verbatim

the explanation in the 1998 Offering Memorandum of the cost savings the Company expected to

achieve in facility consolidation, waste internalization, and selling, general and administrative cost

savings as a result of the Safety-Kleen Acquisition.  The Company also reported the same

financial results for the years ended August 31, 1994, 1994, 1995, 1996 and 1997 that it had

reported in the 1998 Offering Memorandum.  The Form S-4 contained consolidated financial

statements of LES for the years ended August 31, 1996 and 1997 as audited by Coopers, as well

as for the six-month period ended February 28, 1998.  It also included Coopers' unqualified audit

opinion covering the fiscal 1996 and fiscal 1997 financial statements, and Coopers' consent, dated

June 22, 1998, to the inclusion of its audit opinion in the registration statement.

143.    The June 24, 1998 Form S-4 was signed on behalf of LES by Bullock, Haworth,

Tippie, Wareham, Winger, and Humphreys, and on behalf of Services by Winger and Humphreys.

In the Form S-4, Bullock, Haworth, Tippie, Wareham and Winger also appointed Humphreys as

their attorney-in-fact and agent to sign all amendments to the Form S-4 on their behalf.

144.    On July 7, 1998, LES (d/b/a Safety-Kleen) issued a press release announcing its

operating results for the third quarter of fiscal 1998, the period ended May 31, 1998.  According

to the press release, for the third quarter of 1998, the Company's revenues were up 135% from the

comparable quarter in 1997, to $365.7 million, with a net income of $15.5 million, or $0.05 per

share, as compared to revenues of $155.3 million and a net loss of $196.9 million, or a loss of

$0.13 per share for the third quarter of 1997.

145.    On July 15, 1998, LES (d/b/a Safety-Kleen) filed a Form 10-Q with the SEC for

the third quarter of 1998, the period ending May 31, 1998, which was signed by Defendants

Winger and Humphreys and repeated the previously announced financial results.  In addition to

the foregoing, the Form 10-Q also contained, among other things, the following materially false

and misleading statement:

>       The accompanying interim consolidated financial statements have
>       been prepared in accordance with the instructions to Form 10-Q and
>       Rule 10-01 of Regulation S-X. . . .  In the opinion of management,
>       all adjustments considered necessary for a fair presentation of the
>       interim period results have been included; all such adjustments are
>       of a normal recurring nature.

146.    On September 23, 1998, TD Securities initiated coverage of Safety-Kleen with a

"Buy" recommendation.  William Hoffman, an analyst for TD Securities, wrote in a High Yield

Research Update that the recommendation was based upon "the potential for additional synergies

that should result in increased cash flow and significant debt reduction."  In particular, Hoffman

"concur[red] with management's estimate that it can achieve in excess of $130mm of operating

cash flow synergies" from the Safety-Kleen Acquisition, and that it "expect[ed] debt reduction in

excess of $270mm over the next two years, resulting in a debt to total capitalization ratio less than

60%."  TD Securities also stated that the 2008 Bonds were at that time "indicated at a bid price of

100.5 to yield 9.2%, a 447 basis point spread to Treasuries, which indicates potential for incremental spread tightening in the immediate term."

147.    On October 6, 1998, LES (d/b/a Safety-Kleen) issued a press release to announce its "record" operating results for the fourth quarter and fiscal year ended August 31, 1998. According to the press release, for the fourth quarter of 1998, the Company's revenues totaled $435 million, up 107% from the fourth quarter of the previous year, and the Company realized net income of $21.8 million, or $0.06 per share, as compared to revenues of $210 million and earnings per share of $0.04, for the same period the prior year. For the twelve months ended August 31, 1998, reported revenues totaled $1.185 billion as compared to $678.6 million reported in the prior year, representing a 75% increase. Summarizing the results, Winger stated:

> The combination of the Companies continues to proceed as planned and we are extremely pleased with all aspects of the integration. Significant cost savings have been achieved to date, as evidenced by the increase in operating income margins from 15.2% in the third quarter to 18.2% in the fourth quarter of 1998. . . .

148.    On October 9, 1998, the Company and Services filed with the SEC an amended registration statement for the 2008 Bonds on Form S-4/A. This Form S-4/A contained the consolidated financial statements for LES for the years ended August 31, 1995, 1996 and 1997, and for the nine-month period ended May 31, 1998. It also included Coopers' unqualified audit opinion covering the fiscal 1996 and fiscal 1997 financial statements, and Coopers' consent, dated October 6, 1998, to the inclusion of its audit opinion in the Form S-4/A. The Form S-4/A was signed by Humphreys on behalf of himself and as attorney-in-fact for Bullock, Haworth, Winger, Tippie, and Wareham.

-55-

149.    On October 23, 1998, the Company and Services filed an Amendment No. 2 to

Form S-4 Registration Statement for the 2008 Bonds (the "1998 Registration Statement") with the

SEC . The 1998 Registration Statement was signed by Humphreys on behalf of himself and as

attorney-in-fact for Bullock, Haworth, Winger, Tippie, and Wareham. The 1998 Registration

Statement incorporated by reference the LES Form 10-K filing for fiscal 1997 (the "1997 10-K")

and contained the same consolidated financial information as the October 9, 1998 Form S-4/A, as

well as the financial results for the quarter and year ended August 31, 1998, as derived from the

consolidated financial statements of the Company as audited by Coopers, stating as follows:

> [R]evenue for the fourth quarter ended August 31, 1998 totaled
> $435.0 million, up 107% from $210.1 million in the fourth quarter
> in fiscal 1997. Operating income for the fourth quarter increased
> 183% to $79.1 million for an operating margin of $18.2%. This
> compares with operating income of $28.0 million and an operating
> margin of 13.3% in the same quarter of fiscal 1997. Income from
> continuing operations for the fourth quarter of fiscal 1998 was $21.8
> million or $0.06 per share on both a basic and diluted basis. Net
> income for the three months ended August 31, 1997 was $8.4
> million or $0.04 per share on a diluted basis.
>
> *       *       *
>
> For the twelve months ended August 31, 1998, consolidated
> revenue totaled $1.185 billion, an increase of 75% compared with
> total revenue of $678.6 million in fiscal 1997. Operating income
> for fiscal 1998 was $120.4 million as compared to a loss of $264.7
> million in fiscal 1997. Income from continuing operations in fiscal
> 1998 was $11.5 million or $0.05 per share on a diluted basis.

150.    The financial results and audit opinion in the 1998 Registration Statement were

materially false and misleading as a result of the improper accounting practices alleged herein, as

well as other improper accounting practices uncovered by the Company during its internal

investigation and restatement process.

151.    The 1998 Registration Statement became effective on October 23, 1998, and on or before January 5, 1999, Plaintiff exchanged its unregistered 2008 Bonds (CUSIP # 501849AA1) for registered 2008 Bonds (CUSIP #78649QAA3).

152.    On October 29, 1998, LES (d/b/a Safety-Kleen) filed with the SEC its Form 10-K for the year ended August 31, 1998 (the "1998 10-K"). The 1998 10-K, which was signed by Defendants Bullock, Winger, Humphreys, Haworth, Tippie, and Wareham, contained the previously announced financial results and reported that the Company had recorded revenues of $1,185,473,000, operating income of $120,392,000 and income per share of $0.05 from continuing operations for the fiscal year ended August 31, 1998. The financial results in the 1998 10-K were audited by PwC, which rendered an unqualified opinion on those financial results which was included in the 1998 10-K with PwC's consent:

> In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, cash flows, and changes in stockholders' equity present fairly, in all material respects, the financial position of Safety-Kleen Corp. and its subsidiaries at August 31, 1998 and 1997, and the results of their operations and their cash flows for each of the three years in the period ended August 31, 1998, in conformity with generally accepted accounting principles. . . . We conducted our audits of these statements in accordance with generally accepted auditing standards which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. . . . We believe that our audits provide a reasonable basis for the opinion expressed above.

153.    Besides containing financial results that were materially misstated as a result of the improper accounting practices alleged herein (among others), the 1998 10-K contained the following materially false or misleading statements, among others, regarding the Company's accounting practices:

-57-

(a)    "All significant intercompany balances and transactions have been eliminated in consolidation;"

(b)    "The Company accrues for estimated closure and post-closure costs over the life of the landfill site as capacity is consumed. The Company accrues for costs associated with environmental remediation obligations on a site basis when such costs are probably and reasonably estimable;" and

(c)    "Depreciation and amortization of . . . property, plant and equipment is provided substantially on a straight-line basis over their estimated useful lives. . . ."

154.    On January 5, 1999, Safety-Kleen issued a press release announcing its results for the first quarter of 1999, the period ending November 30, 1998. According to the press release, for the first quarter of 1999, the Company reported revenues of $467 million, and net income of $27.8 million, or $0.27 per share. Defendant Winger commented on the results in pertinent part as follows:

> This has been a very active quarter for the Company. I am pleased with the progress we have made to date in achieving the integration benefits available with the Safety-Kleen acquisition. The increase in operating income margins from 15.2% in the third quarter of 1998 to 18.2% in the fourth quarter of 1998 and to 19.3% in the first quarter of 1999 reflects this progress. Revenue grew 7.4% in the first quarter of 1999 over the preceding quarter as a result of event business increasing to more normal levels and growth in our Collection and Recovery services.

155.    On January 14, 1999, the Company filed a Form 10-Q with the SEC for the first quarter of fiscal 1999, the period ending November 30, 1998, which was signed by defendants Winger and Humphreys and contained the same financial results announced on January 5, 1999.

In addition, the Form 10-Q also contained, among other things, the following materially false and misleading statement.

> The accompanying interim consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. . . . In the opinion of management, all adjustments considered necessary for a fair presentation of the interim period results have been included; all such adjustments are of a normal recurring nature.

156.    On January 22, 1999, Hoffman of TD Securities issued a "BUY" recommendation on Safety-Kleen's Bonds. The Update stated that the recommendation was "based on improving operating margins, potential for further debt reduction and attractive value relative to Allied Waste and other industrial credits. Reinforcing our opinion is Safety-Kleen's stable business profile and high barriers to entry." The Update also highlighted Safety-Kleen's purportedly improving cash flow and credit position:

> We believe that Safety-Kleen should have potential for additional spread tightening of approximately 50 to 75 basis points in the intermediate term, despite seasonally lower expected cash flow in the second quarter. Leverage has improved to 4.4 times relative to run rate EBITDA from 4.9 times in the company's fiscal fourth quarter (August 30, 1998). In addition, significant free cash flow and the proceeds from asset sales should enable the company to continue to improve its credit position. However, we also believe that the company is likely to make additional acquisitions to bolster its revenue growth, which could slow its pace of de-leveraging in the near term. Safety-Kleen 9.25% Senior Subordinated Notes are currently indicated at an offered price of 105.5 to yield 8.3%, a 360 basis point spread to Treasuries.

157.    On March 30, 1999, Safety-Kleen issued a press release announcing its results for the second quarter of fiscal 1999, the period ending February 28, 1999. According to the press release, for the second quarter of 1999, the Company reported revenues of $402.1 million and net

-59-

income of $18.2 million, or $0.19 per share, as compared to revenues of $173.2 million and

earnings per share of $0.08, for the same period the prior year, representing a revenue increase of

132%. Defendant Winger commented on the results in pertinent part as follows:

> I am quite satisfied with the Company's acquisition integration
> progress. We have raised our target for cash synergy's to $165
> million and expect to achieve this annualized level during the
> second half of this fiscal year. We are seeing year-to-year price and
> volume growth of just under four percent from the Company's
> former operations and growth rates from the acquired Safety-Kleen
> operations of 7-8%. These revenue growth rates should accelerate
> by the end of this fiscal year as our sales and service personnel are
> now armed with the most complete menu of service offerings in the
> industry.

158.    On April 14, 1999, the Company filed a Form 10-Q with the SEC for the second

quarter of 1999, the period ending February 28, 1999, which was signed by Defendants Winger

and Humphreys and contained the same information announced on March 30, 1999. In addition

to the foregoing, the Form 10-Q also contained, among other things, the following materially false

and misleading statement:

> The accompanying interim consolidated financial statements have
> been prepared in accordance with the instructions to Form 10-Q and
> Rule 10-01 of Regulations S-X. . . .  In the opinion of management,
> all adjustments considered necessary for a fair presentation of the
> interim period results have been included; all such adjustments are
> of a normal recurring nature.

159.    All of the foregoing statements regarding the Company's financial results were

materially false and misleading as a result of the accounting manipulations alleged herein. In

addition, the Company's statements regarding its actual and projected synergistic cost savings

were materially false and misleading, because they were based upon inaccurate historical financial

results.

## SAFETY-KLEEN ISSUES ANOTHER $225 MILLION
## OF BONDS TO FILL LAIDLAW'S COFFERS

160.    In early 1999, Laidlaw decided to sell the PIK debenture. Bullock informed Winger that Laidlaw thought Safety-Kleen should purchase the PIK from Laidlaw. Winger then negotiated on behalf of Safety-Kleen for the price at which Safety-Kleen would repurchase the PIK, while Bullock negotiated for Laidlaw. However, Bullock received from Winger the same information that other members of the Board were provided to consider the repurchase, and Haworth was provided the calculations that Humphreys prepared of the financial impact to Safety-Kleen of the repurchase. Thus, Bullock and Haworth were privy to both sides of the negotiations.

161.    On April 19, 1999, Safety-Kleen issued a press release announcing that it "intends to offer up to $225 million of senior notes due 2009 ..." On the same day, the Company announced its agreement to repurchase its outstanding $350 million PIK Debenture from Laidlaw for $200 million in cash and 11,320,755 shares of Safety-Kleen common stock. The Company stated that the funds generated from the $225 million offering ("the 1999 Offering") of the 2009 Bonds would fund the cash portion of the purchase of the PIK Debenture.

162.    Like the 2008 Bonds, the 2009 Bonds were issued via a two-step process, whereby the bonds were issued to investors as unregistered bonds pursuant to an Offering Memorandum, and were subsequently exchanged for registered but otherwise identical bonds. The bonds were priced from the outset as registered, fully tradeable securities.

163.    The Offering Memorandum for the 2009 Bonds (the "1999 Offering Memorandum") was created by Safety-Kleen, the Individual Defendants, and TD Securities, and was disseminated to investors in the spring of 1999. TD Securities was a lead underwriter and

-61-

initial purchaser for the 2009 Bonds. As such, TD Securities initially purchased the 2009 Bonds

from the issuer with a view toward immediately reselling them to investors like Plaintiff. TD

Securities was compensated for its services by a discount between the price at which it initially

purchased the 2009 Bonds from the issuer and the offering price. This difference of 2.5% (*i.e.*,

TD Securities' fee) was the industry standard for underwriters of public offerings.

164.    The 1999 Offering Memorandum was used by Safety-Kleen, the Individual

Defendants and TD Securities to solicit investors to purchase the 2009 Bonds in the first step of

the offering, as well as to participate in the second step exchange by which the 2009 Bonds

achieved their status as registered, freely tradeable securities. The two steps of the offering were

inseparable, and each and every communication soliciting the participation of any person in the

first step necessarily also solicited participation in the second step.

165.    Defendant PwC reviewed the 1999 Offering Memorandum prior to its issuance and

provided "comfort letters" to TD Securities with respect to the financial information contained

therein. With PwC's consent, its audit opinion on the Company's fiscal 1997 and fiscal 1998

financial statements was included in the 1999 Offering Memorandum.

166.    The proceeds of the sale of the 2009 Bonds were not being used for operating

purposes but rather to repurchase the PIK Debenture. As a result, the 1999 Offering

Memorandum highlighted the success of Safety-Kleen in order to induce purchasers of the 2009

Bonds to make an investment in the Company that was to immediately leave the Company.

167.    The 1999 Offering Memorandum described the Company as a "vertically

integrated hazardous and industrial waste management company" whose "breadth and quality of

-62-

... service offerings, combined with the geographic scope of [its] facilities, have provided [it] with a leading market position in [the] industry."

168.    The 1999 Offering Memorandum further explained the Company's business strategy and competitive strengths as follows:

### Business Strategy

Our strategy is to continue to vertically integrate our operations and enhance our profitability by further rationalizing operations, internalizing waste streams and expanding the services we provide to our customer base. Key elements of our strategy include:

- completing our costs savings program relating to the acquisition of Old Safety-Kleen;

- evaluating additional acquisitions that may complement our existing service network and infrastructure;

- increasing waste internalization rates;

- increasing revenues by cross selling the combined Company's services to our expanded customer base; and

- expanding the number of services we offer our customers by leveraging our expertise and customer relationships to provide cost effective and comprehensive solutions for all of their environmental needs.

### Competitive Strengths

*Low-cost service provider.* With over-expansion in the hazardous and industrial waste industry during the 1980s and the early 1990s, it has become critical for successful waste management companies to maintain high capacity utilization of a well-managed fixed asset base. We have created a cost structure which we believe is the lowest in the industry.

-63-

> *Vertically integrated approach.* From collection through treatment and disposal, we deliver a closed-loop solution for any type of waste stream. We believe that we offer a broader array of services from more locations than any other waste services provider. Accordingly, we believe we can provide our customers with a single source for their hazardous and industrial waste needs while decreasing costs by maintaining a high rate of waste stream internalization. . . .

169.    The 1999 Offering Memorandum also explained that the Company had sufficient

liquidity and capital resources:

> *Working Capital.* Total cash provided by operations during the six months ended February 28, 1999 was $81.7 million. This was comprised of $143.3 million from operations before financing working capital requirements of $13.8 million and $48.8 million related to spending on acquisition liabilities. The cash provided by continuing operations during fiscal 1998, 1997 and 1996 was $87.6 million, $37.0 million and $21.9 million, respectively. In fiscal 1998, cash from operations was comprised of $192.0 million from operations before financing working capital requirements of $47.1 million and $57.3 million related to spending on acquisition liabilities.

*    *    *

> We believe that our existing level of working capital is adequate for normal growth and operating needs. Trade and other accounts receivable continue to represent the largest portion of current assets, totaling $320.0 million at August 31, 1998. The average days sales outstanding was reduced to 66 days, from 93 days at August 31, 1997 primarily as a result of the lower average days outstanding of the Old Safety-Kleen operations. Our primary sources of liquidity are cash flows from operations, existing cash and short-term investments of $10.9 million as of February 28, 1999, and available borrowings under bank lines and the Revolver of the Senior Credit Facility.

> *Capital Expenditures and Capital Resources.* Investing activities for the six months ended February 28, 1999, generated cash of $105.1 million. Investing activities from continuing operations used cash of $1,293.3 million, $21.9 million and $114.9

-64-

million in fiscal years 1998, 1997 and 1996, respectively. In fiscal 1998, $1,281.5 million was incurred in connection with the acquisition of Old Safety-Kleen. Net expenditures for the purchase of fixed assets for normal replacement requirements and increases in services were $29.7 million and net proceeds from the recapitalization of the European operations were $138.7 million during the six months ended February 28, 1999. Net expenditures for the purchase of fixed assets for normal placement requirements and increases in services were $50.8 million, $36.1 million and $104.3 million in fiscal 1998, 1997 and 1996, respectively. Our projected capital expenditures for fiscal 1999 are approximately $80.0 million.

Upon repurchase of the PIK Debenture, we (together with our subsidiaries) will have an aggregate of $2.0 billion of indebtedness outstanding, including $1.3 billion under the Senior Credit Facility. During the balance of fiscal 1999, scheduled principal payments on our indebtedness will total $39.0 million. As of February 28, 1999, there was $340 million of borrowing availability under the Revolver of the Senior Credit Facility. The Senior Credit Facility contains customary negative, affirmative, and financial covenants, including covenants limiting annual capital expenditures, restricting debt, guaranties, liens, mergers and consolidations, sales of assets and payment of dividends. . . .

We believe that our existing working capital (consisting of cash and short-term investments), together with borrowings under the Senior Credit Facility, and anticipated cash flow from operating activities will be sufficient to meet our debt service and expected operating and capital spending requirements and environmental liability requirements for the next twelve months. To the extent that any additional capital is required for any purpose (including potential acquisitions), we believe that we will be able to raise such capital in the public or private debt or equity markets.

170.    The 1999 Offering Memorandum provided historical and selected consolidated

financial data for the Company and its subsidiaries, including: revenues of $652,973,000,

$678,619,000 and $1,185,473,000 for fiscal years ended August 31, 1996, August 31, 1997 and

August 31, 1998, respectively; basic earnings (loss) per share of $0.07, ($1.33) and $0.00,

-65-

respectively for those fiscal years; EBITDA of $105,610,000, $120,489,000, and $279,274,000, respectively for those fiscal years; and EBITDA of $437,863,000 for the twelve-month period ended February 28, 1999. These financial results were derived from the Company's consolidated financial statements as audited and/or reviewed by PwC.

171.    The 1999 Offering Memorandum presented *pro forma* EBITDA figures for the Company of $393,990,000 and $451,152,000, respectively, for the fiscal year ended August 31, 1998, and the twelve-month period ended February 28, 1999, giving effect to the Safety-Kleen Acquisition and related transactions as if they occurred on September 1, 1997.

172.    According to the 1999 Offering Memorandum, "EBITDA represents operating income plus (i) depreciation and amortization and (ii) for fiscal 1998 and the twelve months ended February 28, 1999, the $65.8 million non-recurring restructuring charge incurred in connection with the acquisition of Old Safety-Kleen." The Offering Memorandum stated that "EBITDA is presented because it provides useful information regarding [Safety-Kleen's] ability to service debt." Defendants understood that the ability to service debt was of critical importance to prospective purchasers of debt securities such as the Bonds.

173.    The historical and *pro forma* EBITDA figures in the 1999 Offering Memorandum were materially false and misleading because the Defendants knew or should have known facts (including facts relating to the Company's accounting practices) which rendered the components of the EBITDA calculation, including income, depreciation and amortization, inaccurate.

174.    The first page of the 1999 Offering Memorandum highlighted the substantial cost savings purportedly achieved by the Company by virtue of the Safety-Kleen Acquisition, and the

resulting Adjusted EBITDA estimates of $485.2 million which could be used for debt service for the Bonds:

> We currently expect to realize approximately $165 million of annual cash cost savings as a result of this acquisition. As of February 28, 1999, we believe we have realized approximately $130 million in annualized cash cost savings through the closure of redundant facilities, personnel reductions, the elimination of duplicative administrative costs and the internalization of waste disposal activities.

Based, in part, on these cost savings, Safety-Kleen reported: "For the twelve months ended February 28, 1999, our pro forma revenues and Adjusted EBITDA (as defined) were $1.8 billion and $485.2 million, respectively." All of these statements were materially false and misleading, because the Company had not realized $130 million in annualized cost savings as a result of the Safety-Kleen Acquisition, and because the Defendants knew or should have known other facts (including facts relating to the Company's accounting practices) which rendered their projections as to future cost savings, *pro forma* revenues and Adjusted EBITDA inaccurate.

175.    The 1999 Offering Memorandum disclosed that, under the Senior Credit Facility, Services was "required to obtain interest rate protection satisfactory to [an affiliate of TD Securities] in respect of at least 40% of its floating rate debt for a period of at least two years." The 1999 Offering Memorandum also stated that "[t]he Company uses interest rate swap agreements to minimize the impact of interest rate fluctuations on floating interest rate long-term borrowings," and that "[t]he differential paid or received on interest rate swap agreements is recognized as an adjustment to interest expense." These representations were materially false and misleading, because the Company's interest rate swap agreements were actually increasing, rather than reducing, the impact of interest rate fluctuations on the Company, and because the premiums

-67-

the Company had been receiving on these derivative contracts were being recorded as revenue rather than as adjustments to interest expense.

176.   TCW purchased 2009 Bonds in the initial offering on behalf of Plaintiff, after reading (and in reliance upon) the Company's 1998 10-K, the 1999 Offering Memorandum, and other public filings, including the false financial statements that would later be withdrawn and restated.

### SAFETY-KLEEN CONTINUES TO PUT OUT FALSE INFORMATION

177.   On May 27, 1999, Safety-Kleen filed a Form 8-K with the SEC, containing unaudited pro forma combined financial information for the year ended August 31, 1998, giving effect to the Safety-Kleen Acquisition as if it had occurred on September 1, 1997. In addition to reiterating historical financial results of LES from the 1998 10-K which were materially false, the Form 8-K falsely stated that the Safety-Kleen Acquisition had been accounted for "using the purchase method of accounting applied in accordance with generally accepted accounting principles," and that "the assets and liabilities of Old Safety-Kleen [had] been recorded at their estimated fair value, with any difference between the amount of such fair value and the purchase price being recorded as goodwill."

178.   On July 6, 1999, Safety-Kleen issued a press release announcing its results for the third quarter of fiscal 1999, the period ending May 31, 1999. According to the press release, for the third quarter of 1999, the Company reported revenues of $400.9 million and net income of $29.7 million, as compared to revenues of $365 million for the same period the prior year.

179.   On July 12, 1999, Safety-Kleen filed a Form S-4 Registration Statement relating to the 2009 Bonds with the SEC. The Form S-4 contained substantially similar information to the

-68-

1999 Offering Memorandum, including financial data for the fiscal year ended August 31, 1998 and the period ended February 28, 1999. The Form S-4 Registration Statement was signed by Bullock, Haworth, Humphreys,Winger, Tippie, and Wareham. In the Form S-4, Bullock, Haworth, Winger, Tippie, and Wareham also appointed Humphreys as their attorney-in-fact and agent to sign all amendments to the Form S-4 on their behalf. It also included PwC's unqualified audit opinion covering the fiscal 1997 and fiscal 1998 financial statements.

181. On or about July 15, 1999, the Company filed a Form 10-Q with the SEC for the third quarter of 1999, the period ending May 31, 1999, which was signed by Defendants Winger and Humphreys and contained the financial results announced on July 6, 1999. In addition to the foregoing, the Form 10-Q also contained, among other things, the following materially false and misleading statement:

> The accompanying interim consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. . . . In the opinion of management, all adjustments considered necessary for a fair presentation of the interim period results have been included; all such adjustments are of a normal recurring nature.

181. On August 10, 1999, Safety-Kleen filed with the SEC an amended registration statement for the 2009 Bonds on Form S-4/A (the "1999 Registration Statement"). The 1999 Registration Statement was signed by Humphreys on behalf of himself and as attorney-in-fact for Bullock, Haworth, Winger, Tippie, and Wareham. In language similar to that in the 1999 Offering Memorandum, the 1999 Registration Statement described the Company, its business strategy and competitive strengths, and explained that the Company had sufficient liquidity and capital resources. The Company repeated its representations contained in the 1999 Offering

Memorandum that its "existing level of working capital is adequate for normal growth and operating needs" and that "existing working capital (consisting of cash and short-term investments), together with borrowings under the Senior Credit Facility, and anticipated cash flow from operating activity will be sufficient to meet [the Company's] debt service and expected operating and capital spending requirements and environmental liability requirements for the next twelve months." These statements were materially false and misleading because the Company's actual levels of working capital (which were concealed from investors) were insufficient to meet the Company's requirements.

182.    The 1999 Registration Statement contained the same misrepresentations regarding Safety-Kleen's financial results for the year ended August 31, 1998 as did the 1999 Offering Memorandum. The 1999 Registration Statement incorporated by reference the 1998 Form 10-K, and also reported financial results of Safety-Kleen for the nine-month period ended May 31, 1999, including revenue of $1,270,089,000, net income of $75,711,000, net income per share of $0.86, and EBITDA of $358,398,000. It also included PwC's unqualified audit opinion covering the fiscal 1997 and fiscal 1998 financial statements, and PwC's consent, dated August 9, 1999, to the inclusion of its audit opinion in the 1999 Registration Statement. The audit opinion, financial statements, and other financial data in the 1999 Registration Statement were materially false and misleading as a result of the improper accounting practices alleged herein.

183.    The 1999 Registration Statement became effective on August 10, 1999, and on or before September 27, 1999 Plaintiff exchanged its unregistered 2009 Bonds (CUSIP # 78648RAA2) for registered 2009 Bonds (CUSIP # 78648RAB0).

-70-

## LAIDLAW TRIES TO TAKE THE MONEY AND RUN
## BEFORE THE TRUTH CAN BE DISCOVERED

184.    On August 27, 1999, Safety-Kleen announced that it had completed its repurchase of the PIK Debenture from Laidlaw for approximately 11.3 million Safety-Kleen common shares and $200 million in cash.  The transaction resulted in Laidlaw beneficially owning 43.8 million common shares of Safety-Kleen, or 43.6% of Safety-Kleen stock.

185.    On September 13, 1999, Safety-Kleen announced in a press release that it had been informed that Laidlaw planned to actively seek a buyer for its interest in the Company and to complete this divestiture over the course of the next six to twelve months.  Safety-Kleen also announced on September 13, 1999, that the Board had appointed a Special Committee made up of non-Laidlaw directors to consider the implications of the announced change in Laidlaw's time horizon for divesting its 44% common share ownership of the Company.

186.    On October 5, 1999, Safety-Kleen issued a press release announcing its results for the fourth quarter and fiscal year ended August 31, 1999.  That press release was filed with the SEC as an attachment to a Form 8-K filed by Safety-Kleen, and signed by Winger, on October 6, 1999.  According to the press release, for the fourth quarter of 1999, the Company reported revenues of $415.9 million and net income of $28.2 million, or $0.28 per share, as compared to revenues of $435 million and earnings per share of $0.22, for the same period the prior year.  For the twelve months ended August 31, 1999, reported revenues totaled $1,685.9 million, an increase of 42.2% over $1,185.5 million reported in the prior year.  Defendant Winger commented on the results in pertinent part as follows:

> The aggressive goals that we set for the Company in fiscal 1999 were met.  Dramatic cost savings were achieved.  The integration of

our revenue generating services, our staff and our business procedures have been largely completed. We have continued to build upon the positive aspects of last year's merger. The result is the most efficient and focused company in the industrial marketplace today. We are now beginning to see the growth that Safety-Kleen can produce. Specifically, we are encouraged by growth of more than 5% from the core components of our current business. Our leading position and continued commitment to providing effective solutions to customer needs will provide for continued progress in fiscal 2000.

187.    On October 12, 1999, Safety-Kleen announced that it had received a detailed report from its Special Committee on strategic and financial alternatives for the Company. The Special Committee recommended, and the Board unanimously agreed, that the Board "begin discussions with likely sale or merger candidates." Defendant Winger noted that the Special Committee had "initially concluded that a sale or merger of Safety-Kleen will probably result in the best value for all shareholders at this time...."

188.    On October 29, 1999, Safety-Kleen filed with the SEC its Form 10-K for fiscal year 1999 ended August 31, 1999 (the "1999 10-K"), which was signed by Defendants Bullock, Haworth, Winger, Humphreys, Tippie, and Wareham. The 1999 10-K contained the financial results previously announced in the October 5, 1999 press release and contained financial statements audited by PwC.

189.    The 1999 10-K specifically touted the cost savings that had already been achieved through the Safety-Kleen Acquisition: "The Company estimates that the vast majority of available cost reduction measures associated with the acquisition of Old Safety-Kleen has been achieved by the fourth quarter of fiscal 1999."

190.    In addition to containing false financial data, the 1999 10-K contained the

following false or misleading statements regarding the Company's accounting practices, among

others:

(a)    "All significant intercompany balances and transactions have been

eliminated in consolidation;"

(b)    "The Company accrues for estimated closure and post-closure costs over

the life of the landfill site as capacity is consumed.  In accordance with American Institute of

Certified Public Accountants Statement of Position 96-1 ("SOP 96-1"), the Company accrues for

costs associated with environmental remediation obligations on a site basis when such costs are

probable and reasonably estimable;" and

(c)    "Depreciation and amortization of . . . property, plant and equipment is

provided substantially on a straight-line basis over the estimated useful lives. . . ."

191.    PwC's "Report of Independent Accountants" was included, with PwC's consent, in

the 1999 10-K.  That report stated in pertinent part:

> In our opinion, the accompanying consolidated balance sheets and
> the related consolidated statements of income, comprehensive
> income, cash flows and stockholders' equity present fairly, in all
> material respects, the financial position of Safety-Kleen Corp. and
> its subsidiaries at August 31, 1999 and 1998, and the results of their
> operations and their cash flows for each of the three years in the
> period ended August 31, 1999, in conformity with generally
> accepted accounting principles. . . .  We conducted our audits of
> these statements in accordance with generally accepted auditing
> standards, which require that we plan and perform the audit to
> obtain reasonable assurance about whether the financial statements
> are free of material misstatement. . . .  We believe that our audits
> provide a reasonable basis for the opinion expressed above.

-73-

192.     On January 4, 2000, Safety-Kleen issued a press release announcing its operating results for the first quarter of fiscal 2000, the period ending November 30, 1999. That press release was filed with the SEC as an attachment to a Form 8-K filed by Safety-Kleen, and signed by Humphreys and Winger, on January 7, 2000. According to the press release, for the first quarter of fiscal 2000, the Company reported revenues of $408.5 million, operating income of $83.1 million, net income of $24.7 million, or $0.25 per share, and operating margins of 20.3% (up from 19.3% in the same quarter in fiscal year 1999). The Company's EBITDA totaled $116.8 million, and its EBITDA margins rose to 28.6% from 27.3% in the prior year.

193.     On or about January 14, 2000, the Company filed a Form 10-Q with the SEC for the first quarter of fiscal 2000, the period ending November 30, 1999, which was signed by Defendants Winger and Humphreys and contained the financial results previously announced on January 4, 2000. The Form 10-Q also contained, among other things, the following materially false and misleading statement:

> The accompanying interim consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. . . .  In the opinion of management, all adjustments considered necessary for a fair presentation of the interim period results have been included; all such adjustments are of a normal recurring nature.

194.     On January 24, 2000, Edward A. Siegel ("Siegel") of TD Securities placed a "BUY" recommendation on the Bonds, as reported in TD's High Yield Research Update. That Update provided:

> We see limited downside in these bonds as the fundamental business is sound. We expect operating results will improve over the next several quarters, providing the impetus for spread tightening to the 325 and 385 basis point range for the 2008's and

> 2009's, respectively. . . . We find SK bonds attractive versus comparable issues.
>
> * * *
>
> The Company has ample liquidity to meet its operating and capital requirements at the end of the first quarter, the company had $198 million available on its revolver and <u>was in compliance with all of its covenants under its credit agreement.</u> [emphasis added]

Siegel also forecasted "better times ahead" for the Company, stating:

> SK has all of the components to generate above-market growth and returns. . . . At current run rates the company has the ability to generate approximately $200 million of free cash flow, which would be available for debt reduction. . . . We forecast fiscal year 2000 EBITDA of $474 million compared with management's $475-$515 million. Our estimate would cover interest expense 2.9x. Furthermore, we expect that the company will generate $100 million of free cash flow this year leaving debt at approximately $1.95 billion and leverage at 4.1x. That represents a significant improvement over first quarter's leverage of 4.4x.

## THE TRUTH BEGINS TO EMERGE - HEADS BEGIN TO ROLL

195.    On January 25, 2000, the Company announced that Bullock had resigned as

Director and Chairman of the Board "in compliance with a requirement of Laidlaw." The

Company did not provide any explanation for Bullock's resignation.

196.    On February 8, 2000, the Company held a Board meeting. The materials that were

distributed in connection with that meeting indicated that certain non-cash accounting adjustments

had been made to the Company's accounts and financial statements for the first quarter of fiscal

year 2000. These adjustments were significant, because they masked the fact that actual financial

results from that quarter fell fall short of expectations. Director David Thomas ("Thomas") was

particularly concerned about these adjustments, and intended to ask questions about them during

the meeting. However, the entire meeting was consumed with discussions regarding who would replace Bullock as Chairman, and Thomas did not have an opportunity to raise the issue.

197.    On February 9, 2000, the Company announced in a press release that its Board had appointed Peter Widdrington as a Director and Chairman of the Board "to fill the unexpired term created by a recent resignation." Widdrington was then serving as Chairman and a Director of Laidlaw. The Company also announced that it had formed a three member Executive Committee of the Board consisting of David Thomas as Chairman and Widdrington and Winger as additional members.

198.    On February 10, 2000, the Company announced that it had:

> disbanded the Special Committee of the Board of Directors formed September 13, 1999 for the purpose of considering the implications of the announced change in Laidlaw, Inc.'s time horizon for divesting its 44% common share ownership of the Company. The Special Committee noted that following its review of the alternatives available to Safety-Kleen in light of discussions with potential buyers and given its recent operating performance and stock price the Company has determined that further action regarding a potential sale of the Company is unwarranted at this time.

199.    The Safety-Kleen Board of Directors held another board meeting on February 18, 2000. During that meeting, Thomas got the opportunity to ask questions about the non-cash adjustments from the first quarter. He asked Humphreys whether non-cash adjustments had been made in prior periods, and Humphreys responded that no material non-cash adjustments had been made prior to the first quarter of fiscal year 2000. This was not true.

200.    On February 24, 2000, the Company's General Counsel, Henry Taylor ("Taylor") – who had attended the February 18 meeting and recognized Humphreys' answer as a

-76-

misrepresentation – telephoned Thomas and informed him that a member of the Company's accounting department had come to him with information indicating that the Company's financial statements were being manipulated so as to inflate its reported earnings. Later that day, Thomas spoke with that individual, William Ridings (the Company's controller), who confirmed that the Company was engaged in accounting fraud.

201.    Ridings explained to Thomas that, during the middle of the third month of each quarter, Humphreys would inform the financial management team of the numbers he wanted to report, and would identify the areas where the entries would take place. Ridings and others in the accounting group would then make those entries and Humphreys would approve them. Years later, Ridings gave a similar account of the fraud when he pleaded guilty to, *inter alia*, charges of securities fraud and conspiracy to commit securities fraud in connection with the misstatement of the Company's financial statements for fiscal 1997-1999. As part of his guilty plea, Ridings described his misconduct as follows:

> Beginning in approximately August 1998 and continuing until approximately March 2000, I participated with Paul Humphreys, Thomas Ritter and others in a scheme to make false and misleading entries in the financial books and records of Safety-Kleen. In particular, we created financial records to give the false appearance that the company was generating far higher earnings before interest, taxes, depreciation and amortization, EBITDA, than was in fact the case....

202.    On February 26, 2000, Safety-Kleen retained the law firm of Shaw Pittman to investigate possible accounting irregularities in connection with the Company's prior-period financial statements. On February 28, 2000, Shaw Pittman retained Arthur Anderson LLP ("Arthur Andersen") to assist in that investigation.

203.    Thomas called a special meeting of the Board for March 4, 2000, and invited

Humphreys, Winger, Bragagnolo, all of the directors, Shaw Pittman, and Arthur Anderson to

attend.  The primary purpose of the meeting was to inform the Board of the allegations of

accounting improprieties.  Thomas also requested Board approval to place Winger, Humphreys

and Bragagnolo on administrative leave, to conduct an internal investigation, and to publicly

disclose these actions.  Upon learning of the subject of the meeting, the Laidlaw directors (at that

time Peter Widdrington and Haworth) objected to the meeting going forward, and demanded to

consult legal counsel.  Ultimately, Thomas persuaded Widdrington to allow the meeting to

proceed.

204.    During the March 4, 2000 special meeting, which carried over into March 5, 2000,

Thomas provided the full Board with a detailed description of what he had been told by Ridings.

The presentation also included a summary by Thomas and Grover Wrenn of what they were told

by Ridings and Thomas Ritter, another former employee in the Company's accounting group, on

the evening of March 4, 2000.  During that meeting, Ritter admitted that he had been instructed by

Humphreys to make accounting adjustments which Ritter believed to be wrong, but when he had

expressed discomfort to Humphreys about those adjustments, Winger and Humphreys had bought

his silence with an agreement for two years' salary and benefits.

205.    During the March 4-5, 2000 Board meeting, Thomas and Wrenn explained that

their preliminary investigation indicated that the Company's management had been regularly

making bogus quarter-end and year-end adjustments for the purpose of boosting earnings by

significant amounts, and that the Company's earnings for the first quarter of fiscal 2000 were

-78-

overstated by 50%. They also stated that they had been informed of suspiciously large amounts of documents being shredded by members of senior management during early 2000.

206.    In response to the presentations at the special meeting, Winger denied the allegations, and Humphreys and Bragagnolo remained silent. Haworth reacted very defensively and aggressively, accusing Thomas and Wrenn of not knowing anything about accounting. Haworth came to the defense of Humphreys and Winger, and defended accounting positions which appeared to Thomas and other directors to be indefensible, including the Company's accounting for derivatives and its capitalization of fuel and tire costs. Haworth admitted that Laidlaw, where he was CFO, had engaged in some of the very same accounting practices as the ones being questioned at Safety-Kleen (including derivatives accounting and capitalization of fuel and tires). Haworth took the position that there was nothing wrong with preliminary runs of financial statements, and admitted that he sometimes received as many as 18 in a single accounting period. Haworth's reaction to the allegations led Thomas and other directors to believe that Haworth was aware of and trying to defend the Company's improper accounting.

207.    At the end of the March 5, 2000 meeting, the Board voted to put Winger, Humphreys, and Bragagnolo on administrative leave. The Board also formed a Special Committee consisting of Thomas, Tippie, Grover Wrenn, and Robert Luba, to commence an investigation into the reports of accounting irregularities, and approved making a public disclosure of the fact that allegations of accounting improprieties had been made, and that an investigation had commenced. These actions were not unanimous. Two Laidlaw appointees to the Board -- Haworth and Widdrington – voted against making public disclosure of the

-79-

allegations. In addition, Haworth, Widdrington and Luba voted against placing the Company's executives on administrative leave.

208.    On March 6, 2000, Safety-Kleen announced in a press release that it had "initiated an internal investigation of its prior reported financial results and certain of its accounting policies and practices following receipt by the Company's Board of Directors of information alleging possible accounting irregularities that may have affected the previously reported financial results of the Company since fiscal year 1998." The press release stated:

> The Board has appointed a special committee, consisting solely of four independent outside directors of the Company, to spearhead the internal investigation, and has engaged Shaw Pittman and Arthur Andersen LLP to conduct a thorough and comprehensive investigation of these matters.

In the press release, Thomas promised that, if the allegations were true, the Company would "take all appropriate actions to correct previously issued financial statements, reports or documents that contain erroneous financial information."

209.    The press release further stated that Defendants Winger, Bragagnolo and Humphreys had been placed on "administrative leave" pending the results of the "investigation," and that the Board had elected Grover Wrenn as Vice Chairman of the Board to oversee the management of the Company on an interim basis.

210.    The Company took these drastic steps because it was clear that the so-called "accounting irregularities" were material and would lead to a significant financial restatement in the future.

211.    On March 7, 2000, PwC orally advised the Company that PwC was withdrawing its previously issued audit reports on the Company's financial statements for the years ended

-80-

August 31, 1999, 1998 and 1997. PwC's withdrawal of its reports was disclosed to the public on

March 9, 2000, when Safety-Kleen filed a Form 8-K with the SEC, to which was attached a letter

dated March 8, 2000 from PwC to Grover Wrenn. In that letter, PwC stated that its prior reports

"should no longer be relied upon or associated with the financial statements of Safety-Kleen. . . ."

212.    On March 10, 2000, Moody's Investors Services downgraded the Bonds and

assigned a "negative outlook" for the Company. Approximately $2.4 billion of the Company's

debt was affected.

213.    On March 13, 2000, Standard & Poor's lowered its ratings on Safety-Kleen, and

put all ratings of the Company on "CreditWatch, with negative implications." As noted in a

CreditWise press release by Standard & Poors:

> The downgrades reflect increased uncertainties about the firm's true
> financial performance in recent years following the withdrawal of
> its financial statements by Price WaterhouseCoopers LLP, Safety
> Kleen's auditors, in the wake of an investigation into alleged
> accounting irregularities at the Company. . . . The rating action is
> also based on heightened concerns about Safety-Kleen's sufficient
> liquidity stemming in part from a potential lack of covenants
> compliance with its lending group and the resulting credit
> availability.

214.    On March 13, 2000, the Company again admitted that its previously reported

financial results contained certain undefined accounting irregularities. The Company announced

in a press release that it was "continuing the previously announced internal investigation of its

prior reported financial results and certain of its accounting policies and practices" and that

"[p]reliminary results of such investigation indicate that there have been accounting irregularities

that affected the previously reported financial results of the Company since fiscal year 1998."

215.    The Company also stated in its March 13, 2000 press release that:

> The Company's interim management has determined that the Company's cash position and cash generated from operations will not be sufficient to fund its current operations without engaging in short-term borrowings or selected asset dispositions. The Company is in default under certain financial covenants contained in its credit agreements and is not able to borrow under those agreements without a waiver of such defaults by the lenders. The Company is currently engaged in negotiations with the lenders and will not be in a position to comment further on such negotiations pending their resolution.
>
> The Company has been advised by the staff of the Securities and Exchange Commission that a formal investigation of the Company has been initiated. The Company has advised the Securities and Exchange Commission that it intends to cooperate fully in the investigation.

216.    On March 16, 2000, the Company issued a press release reporting its determination "that there have been accounting irregularities in several areas, including inappropriate recognition of gain on derivatives transactions, improper revenue recognition, inappropriate capitalization of costs, and insufficient liability accruals."

217.    Market reaction to these announcements was immediate as the value of the Bonds plummeted and liquidity dried up.   Having never traded below 85% of par prior to March 6, 2000, the 2009 Bonds plummeted to 3% of par by March 15, 2000, while the 2008 Bonds were trading at only 5.5% of par by March 16, 2000.

218.    On May 12, 2000, the Company announced in a press release the resignation of Winger as President and CEO, Bragagnolo as COO, and Humphreys as CFO.  It was subsequently reported in Safety-Kleen's Form 10-K filing for the fiscal year ended August 31, 2000, that the Company had "terminated the employment of Messrs. Winger, Bragagnolo, and Humphreys in July 2000."

219.     On June 6, 2000, Safety-Kleen announced in a press release that it had failed to make the required interest and principal payments due on certain outstanding debt the prior week. The Company stated that it:

> did not make an interest payment of $1.8 million related to a $60 million Promissory Note dated May 15, 1997. Additionally, the Company did not make a $15 million interest payment on its 9 1/4 percent Senior Notes due 2008; and it did not make a $43 million principal and interest payment under its Senior Credit Facility dated April 3, 1998.

220.     On June 9, 2000, the Company filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.

221.     Also on June 9, 2000, the Board accepted the resignation of Winger from his position as a director of the Company.

222.     On August 8, 2000, the Company filed a Form 8-K with the SEC, stating that the Company had dismissed PwC as its independent accountants on August 1, 2000, and retained Arthur Andersen as successor independent accountants. The Bankruptcy Court later approved the Company's retention of Arthur Anderson for that purpose.

223.     PwC was dismissed based upon the recommendation of the Special Committee and the Audit Committee. Prior to its dismissal, PwC had refused to cooperate in the Special Committee's investigation, denying the Committee and its advisors access to PwC personnel and workpapers.

224.     On November 29, 2000, the Company filed its Form 10-K for the fiscal year ended August 31, 2000 (the "2000 10-K") with the SEC. The 2000 10-K stated that the Special Committee was continuing its investigation regarding the Company's prior reported financial

-83-

results and accounting policies and practices.  The 2000 10-K did not contain financial statements,

but stated that:

> Upon completion of the audit by Arthur Andersen for fiscal years
> ended August 31, 1997 through August 31, 2000, the Company will
> amend this Form 10-K, [and] file audited restated financial
> statements for those four fiscal years, as applicable ...

## THE RESTATEMENT AND THE RESULTS OF THE INTERNAL INVESTIGATION

225.    On July 9, 2001, Safety-Kleen issued the Restatement in the form of a Form

10-K/A which amended its 2000 10-K.  The Restatement included restated financial statements

for each of the fiscal years ended August 31, 1997, August 31, 1998, and August 31, 1999, and

also contained financial statements for the fiscal year ended August 31, 2000.  The Restatement

was approved by Company's Board, including Tippie and Wareham.

226.    In the Restatement, the Company reported that it had discovered material

weaknesses in its internal controls:

> The new management team has identified numerous critical issues
> which will require resolution prior to the Company's emergence
> from its reorganization proceedings.  In addition to these efforts,
> and as part of the restatement process, the Company identified
> material deficiencies in many of its financial systems, processes and
> related internal controls and commenced efforts to correct these
> conditions.  During October 2000, Arthur Andersen LLP reported to
> the Audit Committee of the Board of Directors that the Company
> had material weaknesses in its internal controls and that these
> conditions would be considered in determining the nature, timing
> and extent of their audit tests for fiscal years 1997 through 2000.

227.    The Restatement described the process leading up to the issuance of restated

financial statements, in pertinent part, as follows:

> ... The Company conducted a comprehensive internal review of its
> accounting records for fiscal 1997 to 2000 and engaged Arthur

-84-

Andersen LLP as its new independent public accountants to, among other things, conduct an audit of the Company's consolidated financial statements for the same periods...

This review and investigation resulted in restatements to fiscal 1997 through 1999 which reduced by approximately $567 million the Company's consolidated stockholders' equity as of August 31, 1999 as previously reported in the Consolidated Financial Statements. In addition, significant adjustments to the accounting records related to fiscal year 2000 were made. The Company has expended substantial resources in connection with the restatement efforts and has (i) conducted a comprehensive internal accounting review and determined the nature, amount, and applicable fiscal year of the resulting adjustments, (ii) prepared the Consolidated Financial Statements and all related disclosures and information required for this Form 10-K/A and (iii) assisted its new independent auditors with their audits so that they could report on these periods. While the investigations have not yet been completed, current management believes it has considered all relevant facts and circumstances in connection with the preparation of its fiscal 1997 through 2000 financial statements and believes that further material adjustments are unlikely.

228.    The total effect of the Restatement was to reduce the Company's net income by $1.3 billion, of which the Company was able to attribute approximately $533.6 million to specific years (fiscal 1997 through fiscal 1999). The cumulative after-tax effect of the Restatements on the periods prior to fiscal 1997 was $54.6 million, which was reflected as a charge to retained earnings as of September 1, 1996.

229.    The Restatement, which is incorporated herein by reference, contains a breakdown of the Restatement adjustments, by year, into each of the following primary categories: purchase accounting related items; landfill accounting and environmental liabilities; harbor dredging operations; derivative transactions; capitalized costs; revenue recognition; restructuring and other charges; additional asset adjustments; and additional liability adjustments.

-85-

230.    For fiscal 1997, the Restatement increased the Company's previously reported net loss of $183,432,000 by $118,112,000 (or 64%) , for a restated net loss of $301,544,000.  The Company also reported a restated operating loss of $295 million, and restated negative net cash flow from operating activities of $6.4 million.  For fiscal 1998, the Restatement converted previously reported net income of $205,000 into a net loss of $103,211,000.  The Company also reported a restated operating loss of $2.2 million and restated negative net cash flow from operating activities of $135 million for that year.  For fiscal 1999, the Company's originally-reported net income of $88,876,000 was reduced by $312,031,000, for a restated net loss of $223,155,000, and the Company reported restated operating income of $6.9 million and restated net cash flow from operating activities of $18.5 million.

231.    Safety-Kleen director Grover Wrenn, who participated in the internal investigation into the accounting irregularities, has stated under oath: "[A]ggressiveness is not the appropriate term for the accounting that was being done [prior to the Restatement].  Fraud is the appropriate term for the accounting that was being done."

232.    During the internal investigation, the Special Committee determined that Laidlaw had applied extreme pressure on Winger and Humphreys to meet earnings expectations at all costs, and that Humphreys' actions in relation to the accounting irregularities were in response to the expectations placed on him by Winger, Haworth, and Bullock.

233.    One example of the pressure Bullock applied to Humphreys is what is referred to as the "three cents" issue.  Prior to a July 1999 Board meeting, Bullock received the Company's preliminary third quarter fiscal 1999 financial results, and saw that they were below expectations.  Bullock telephoned Winger and suggested that certain incinerator shut-down costs be shifted from

-86-

the third quarter to the fourth quarter. This was a departure from the treatment of incinerator shut-downs in prior years, when no costs were shifted. Nevertheless, the change was made, and the third quarter earnings per share increased by three cents.

234.    Immediately following the March 4, 2000 Board meeting, Thomas confronted Humphreys and asked him whether he had been pressured by someone to manipulate the numbers. Humphreys responded by asking Thomas if he remembered the three cents issue, and saying "That's what you are looking for." Subsequently, when Thomas again inquired about the motivations behind the fraud, Humphreys replied: "Dave, I'll tell you the same thing I told you at the March 4th-5th board meeting. Look to the three cents and you'll understand who was putting the pressure on me." Bullock and Haworth, acting on behalf of Laidlaw, were the primary source of that pressure.

235.    Laidlaw, Bullock, Haworth, Winger, Humphreys, Bragagnolo, and PwC all refused to cooperate in the internal investigation. Even worse, Haworth took actions to compromise the investigation when, upon being given an opportunity to review documents relating to the allegations which he knew he was not supposed to share with Humphreys, he took notes regarding those documents and faxed them to Humphreys (who was then on administrative leave).

## VIOLATIONS OF GAAP AND SEC REGULATIONS

236.    The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120, at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13, 1984). In addition to the periodic reports required under the Exchange Act, management of a public company has a duty promptly "to make full and prompt announcements of material facts

-87-

regarding the company's financial condition." SEC Release No. 34-8995, 3 Fed. Sec. L. Rep.

(CCH) ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995 (Oct. 15, 1970).  The SEC has emphasized

that "[i]nvestors have legitimate expectations that  public companies are making, and will

continue to make, prompt disclosure of significant corporate developments." SEC Release No.

18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,049, at 84,618 (Nov. 19,

1981).

237.    In Securities Act Release No. 6349 (September 8, 1981), the SEC stated that:

> [I]t is the responsibility of management to identify and address
> those key variables and other qualitative and quantitative factors
> which are peculiar to and necessary for an understanding and
> evaluation of the individual company.

238.    In Accounting Series Release 173, the SEC reiterated that "it is important that the

overall impression created by the financial statements be consistent with the business realities of

the company's financial position and operations."

239.    Under Item 303 of Regulation S-K, promulgated by the SEC under the Exchange

Act, there is a duty to disclose in periodic reports filed with the SEC "known trends or any known

demands, commitments, events or uncertainties" that are reasonably likely to have a material

impact on a company's sales revenues, income or liquidity, or cause previously reported financial

information not to be indicative of future operating results.  17 C.F.R. § 229.303(a)(l)- (3) and

Instruction 3.

240.    SEC Regulation S-X requires that financial statements filed with the SEC conform

with GAAP.  Financial statements filed with the SEC which are not prepared in conformity with

GAAP are presumed to be misleading. 17 C.F.R. § 210.4-01(a)(1).

241.    The Company's financial statements violated SEC Regulations and GAAP, in that they failed to (i) disclose facts necessary to present a fair and truthful representation of Safety-Kleen's financial position and operations, (ii) provide those disclosures which were required by GAAP, and (iii) identify and address those key variables and other qualitative and quantitative factors which were peculiar to and necessary for an understanding and evaluation of the Company. Consequently, the overall impression created by the financial statements was not consistent with the business realities of the Company's reported financial position and operations.

242.    The financial statements that were issued by LES and Safety-Kleen during fiscal 1997, fiscal 1998, fiscal 1999 and the first quarter of fiscal 2000 did not fairly and accurately represent the Company's financial position and operations because they violated the following principles of GAAP, among others:

a)    that the costs of services be matched with, *i.e.*, recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (*see* FASB Statement of Concepts No. 5, ¶ 86.a);

b)    that financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

c)    that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶ 40);

d)    that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibilities to owners for the use of enterprise resources entrusted to it -- to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

-89-

e)       that financial reporting should provide information about an enterprise's financial performance during a certain time period (FASB Statement of Concepts No. 1, ¶ 42);

f)       that financial reporting should be reliable in that it represents what it purports to represent -- that information should be reliable as well as relevant is a central principle of accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

g)       that information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶ 80);

h)       that conservatism be used as a prudent reaction in uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶ 95, 97);

i)       that profit is deemed to be realized when a sale in the ordinary course of business is effected (Chapter IA of ARB No. 43, Paragraph 1);

j)       that revenues should ordinarily be accounted for at the time a transaction is completed (APB Opinion No. 10, Paragraph 12);

k)       that revenues and gains generally are not recognized until realized or realizable, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues (Statement Of Financial Accounting Concepts No. 5, Paragraph 83);

l)       that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form (Statement Of Financial Accounting Concepts No. 2, Paragraph 160);

m)      that contingencies that might result in gains usually are not reflected in the accounts since to do so might recognize revenue prior to its realization (Statement of Financial Accounting Standards No. 5, Paragraph 17);

n)      that losses from contingencies should not be recorded unless it is probable that a loss has been incurred and the amount can be reasonably estimated (FAS Statement of Accounting Standards No. 5, ¶ 14);

o)    that the cost of an asset should be spread over the expected useful life so as to allocate that cost as equitably as possible over the periods during which services are obtained from the use of the asset (Accounting Research Bulletin 43); and

p)    that intercompany balances should be eliminated when preparing consolidated financial statements (Accounting Research Bulletin 51).

243.    In sum, the Company presented its results, including its revenue, profit margins, and earnings, for the interim periods and fiscal years 1997, 1998, 1999, and first quarter of fiscal 2000, in a manner which violated GAAP, SEC regulations, and principles of fair reporting. As a result, the Company's Offering Memoranda, Registration Statements, SEC filings, and other public statements containing financial information for those periods were materially false and misleading and failed to disclose the true financial status of LES and Safety-Kleen. Among other things, this false information prevented investors from discovering that the Company's ability to service its debt, including the Bonds, was at severe risk.

244.    The adverse information misrepresented and/or concealed by Defendants is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### PwC'S VIOLATIONS OF GAAS

245.    As the independent auditors of LES and Safety-Kleen, PwC assisted in the preparation of the Company's annual and quarterly financial statements, reviewed those financial statements and the text that accompanied them in the Company's SEC filings, and audited the annual financial statements. PwC was also responsible for, among other things, examining the

Company's system of internal controls to identify any material weaknesses or reportable conditions which might impact the accuracy or reliability of the Company's financial statements. PwC was required to perform its audit services according to GAAS, which included Statements on Auditing Standards ("SAS") issued by the American Institute of Certified Public Accountants ("AICPA"), and to issue an unqualified opinion only if the Company's financial statements were fairly presented in accordance with GAAP.

246.    During its audits for fiscal 1997, fiscal 1998, and fiscal 1999, PwC discovered material misstatements in the Company's financial statements, and suggested to the Company's management and to the Audit Committee that adjustments be made to correct those misstatements. When management declined to make those adjustments, PwC listed them on a "summary of unadjusted differences," or "SUD." All of the items on the SUD were adjustments that PwC proposed to correct accounting practices that did not comply with GAAP. At the end of each fiscal year, PwC presented a report to the Audit Committee which included a report on the significant items on the SUD. The Audit Committee, like management, failed to make a single one of the adjustments on the SUDs for fiscal 1997, fiscal 1998, or fiscal 1999.

247.    In fiscal 1997, the unadjusted differences reflected on the SUD exceeded 10% of reported cash flow. In fiscal 1998, they were about 22% of pre-tax income, and nearly 25% of after-tax income. In fiscal 1999, they exceeded 5% of net income. PwC violated GAAS by issuing unqualified opinions on each year's financial statements despite the failure to correct these material errors.

248.    There were also material misstatements in the fiscal 1997, fiscal 1998, and fiscal 1999 financial statements that PwC failed to detect during its audits. As a result of its

-92-

longstanding relationship with the Company and Laidlaw which dated back to the 1980s, and the nature of the accounting and auditing services rendered to the Company, PwC personnel were regularly present at Safety Kleen's corporate headquarters throughout the year and had continual access to and knowledge of Safety Kleen's private and confidential corporate, financial and business information, including internal monthly financial records, Board minutes and other internal memoranda, and thus were, or should have been, aware of the true facts as alleged herein concerning the true nature of the Company's financial condition. If PwC had conducted its audits in compliance with GAAS, and not recklessly, it would have detected those misstatements and the improper accounting practices that caused them, and would have either insisted that this information be disclosed to investors, or declined to issue unqualified opinions on the Company's financial statements.

249.    GAAS requires that each audit be planned and performed with an attitude of processional skepticism. PwC failed to do so, and instead accepted numerous representations by the Company's management at face value, without applying an appropriate degree of professional skepticism.

250.    PwC issued unqualified audit opinions on LES's and Safety-Kleen's financial statements for fiscal 1997, 1998 and 1999, stating that PwC's audits were performed in conformity with GAAS and that, in PwC's opinion, the financial statements "fairly presented" the financial position and results of LES (and later Safety-Kleen) in accordance with GAAP. However, as alleged herein, PwC's audit opinions were materially false and misleading, the manner in which the Company's financial results were reported in the Company's financial

-93-

statements represented an extreme departure from GAAP, and PwC's audits represented an extreme departure from GAAS.

251.    GAAS requires that an auditor exercise due professional care in performing an audit and in preparing the audit report. PwC failed to do so. Among other ways, PwC failed to adhere to professional standards by: inadequately planning its audit; inadeqately staffing and supervising its audit; failing to understand the Company's internal control structures sufficiently; failing to obtain sufficient competent evidential matter; and improperly issuing unqualified audit reports.

### PwC Failed to Plan its Audit Adequately

252.    GAAS provides that an audit is to be adequately planned. Audit planning involves developing an overall strategy for the expected conduct and the scope of the audit. In planning an audit, the auditor must obtain knowledge of the matters which relate to the nature of the entity's business, its organization, and operating characteristics. The auditor is required to design the audit with professional skepticism (AU, Section 316) in order to provide reasonable assurance of detecting errors and irregularities (AU 311.03), material misstatements (AU 312) or fraud (AU 316). The auditor also must design the audit plan to account for the possibility that an entity may be unable to continue as a going concern (AU 341).

253.    PwC failed to comply with GAAS because it failed to design its audit plan to provide reasonable assurance of detecting material error as required by Statement of Auditing Standards No.82, *The Auditor's Responsibility to Detect and Report Errors and Irregularities* (AU 316A).

254.    PwC was required under GAAS to obtain knowledge of the Company's business, and apply analytical procedures in planning for its audit. In the course of performing such procedures, PwC knew, or should have known, the facts referenced above which indicated that it should perform an extensive audit of the Company's derivative transactions, fixed assets, revenue, debt and operating costs. PwC prided itself on its long-standing relationship with LES/Safety Kleen which dates back to the 1980s. In fact, PwC's own working papers indicate that PwC sought to have continual presence at Safety Kleen in order to provide even greater services to the Company. The working papers further indicate that LES/Safety Kleen thought of PwC as "our accountants," thus reinforcing the concept that PwC knew or should have known the facts referenced above.

255.    In addition, PwC had access to and reviewed management schedules showing projected costs, revenues, and fixed assets for each of Safety-Kleen's divisions, as well as management's subsequently prepared schedules showing actual costs, revenues and fixed assets for each fiscal year. PwC compared or should have compared each year's schedules to the prior year's schedules showing actual costs, revenues and fixed assets for each division.

256.    PwC also had access to the Senior Credit Facility, which contained a provision requiring interest rate protection for at least 40% of the borrowings thereunder. PwC identified this fact during the course of its audit yet took no steps to independently verify the existence, terms or conditions of the various interest rate swaps in which the Company was engaged. Had PwC confirmed the interest rate swap agreements, it would have seen that the Company was taking on risk and receiving premium payments from counterparties for doing so. PwC would then have been required to expand its testing of the company's cash accounts to determine the

-95-

proper disposition of the cash received. Specifically, PwC would have learned that the Company

was improperly treating these cash receipts as current year revenue. PwC failed to take these audit

steps.

257.    In developing its audit plan, GAAS required PwC to consider the so called "audit

risk" that PwC might fail to recognize that the Company's financial statements were materially

overstated as a result of errors or irregularities. (AU Section 312.02, note 1.) GAAS sets out a

list of red flags that auditors should look for in determining audit risk relating to misstatements

arising from fraudulent financial reporting (AU Section 316.16-18), many of which were present

here, including:

- Motivations for management to engage in fraudulent financial reporting, including a significant portion of management's total compensation being represented by bonuses, stock options, or other incentives, the value of which was contingent upon the entity achieving unduly aggressive targets for operating results, financial position, or cash flow;

- Failures by management to display and communicate an appropriate attitude regarding internal control and the financial reporting process, including lack of effective oversight by the Board or Audit Committee;

- Domineering management behavior in dealing with the auditor, especially involving attempts to influence the scope of the auditor's work.

- High degree of competition or market saturation, accompanied by declining margins.

- Inability to generate cash flows from operations while reporting earnings and earnings growth.

- Assets, liabilities, revenues, or expenses based on significant estimates that involve unusually subjective judgments or uncertainties, or that are subject to potential significant change in the near term in a manner that may have a financially disruptive effect on the entity—such as ultimate collectibility of receivables, timing of revenue recognition, realizability of financial

-96-

> instruments based on the highly subjective valuation of collateral or difficult-to-assess repayment sources, or significant deferral of costs.

- • Unusually high dependence on debt or marginal ability to meet debt repayment requirements; debt covenants that are difficult to maintain.

258. PwC recognized the presence of significant audit risks at Safety-Kleen. In its audit planning documents for fiscal 1997, PwC acknowledged that the Company's management was "often aggressive with accounting matters," and that the cost savings projections for the Safety-Kleen Acquisition were aggressive. In preparation for the 1998 audit, PwC prepared a "Business Risk Assessment" which stated that PwC had observed "unusually aggressive or creative accounting practices" at Safety-Kleen, that "the company has historically used aggressive accounting practices related to depreciation and purchase price allocation," that rapid growth was placing stress on the resources of management or the Company, that the Company was dominated by a few individuals, that the Board as a whole lacked sufficient and timely information with which to monitor the Company's financial position and operating results and business risks, that management was under pressure to achieve more favorable earnings, and that management's compensation was based on the achievement of accounting-based performance measures. When planning the fiscal 1999 audit, PwC recorded its observations that Safety-Kleen used "unusually aggressive or creative accounting practices" and "aggressive accounting policies," that the Company's accounting involved significant accounting estimates involving subjective judgments or uncertainties, that the Company's accounting estimates were "consistently optimistic," that Safety-Kleen had insufficient management depth, and that there was "unusually heavy pressure [on management] to achieve accounting-based performance objectives." Despite these and other acknowledgments of the Company's aggressive accounting practices and other significant audit

-97-

risks, PwC failed to develop and/or follow an adequate audit strategy to mitigate against those risks.

259.    Another fact that should have raised an immediate red flag to PwC was the fact that, at least until March 23, 1999, Haworth – a senior executive officer of Safety-Kleen's parent company, Laidlaw – was Chairman of Safety-Kleen's Audit Committee.  This fact should have raised significant concern for PwC regarding the effectiveness and reliability of the Audit Committee.

260.    PwC either: (1) failed to recognize these red flags and to plan and implement an adequate audit that took into account those audit risks, or (2) if it had an adequate audit plan it failed to follow it, or (3) if it had an adequate plan and followed it, PwC ignored the results of its findings and issued its unqualified opinions anyway.

### PwC Failed to Supervise its Audit Adequately

261.    GAAS requires that the auditor adequately supervise employees conducting the fieldwork (SAS # 22, AU Section 311).

262.    Supervision involves directing the efforts of assistants involved in accomplishing the objectives of the audit and determining whether those objectives were accomplished.  The work performed by each assistant must be reviewed for adequacy and evaluated to determine whether the audit results are consistent with the conclusions expressed in the auditor's reports.

263.    PwC failed to follow these required standards in its audits of the Company's financial statements.  PwC violated GAAS by: (1) failing to provide adequate direction to staff personnel to gather the required evidential matter that would have unveiled the accounting violations described above; and (2) failing to perform adequate review of the work performed by

staff members in connection with the audit, which would have uncovered the failure of PwC

personnel to inspect supporting documentation for the derivative transactions, the fictitious

journal entries, the improper capitalization of costs, the improper changes to environmental

reserves, the improper extension of depreciable lives for fixed assets, and other matters.

### PwC Failed to Understand Safety-Kleen's Internal Control Structure Sufficiently

264.    GAAS Standard of Field Work No. 2 requires the auditor to make a proper study of

existing internal controls, including accounting, financial and managerial controls, to determine

whether reliance on those controls was justified, and if such controls are not reliable, to expand

the nature and scope of the auditing procedures to be applied.  A company's internal control

structure consists of policies and procedures established by the company to provide reasonable

assurance that its objectives will be achieved.  The auditor must focus on the substance of

management's policies and procedures, not their form, because management may establish

appropriate policies and procedures but not act on them.

265.    An auditor must perform procedures to obtain a sufficient understanding of the

three elements of a company's internal control structure: the control environment, the accounting

system, and control procedures.  The control environment, which includes management's integrity

and ethical values, is the foundation of internal control and sets the tone of the organization.  The

auditor must assess control risk -- the risk that a material misstatement contained in the

company's financial statements will not be detected and prevented on a timely basis by the

company's internal control structure policies.  Indeed, the ultimate purpose of assessing control

risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial

statements.