266.    In the course of auditing Safety-Kleen's financial statements, PwC knew or should have known facts which demonstrated that it had failed to sufficiently understand Safety-Kleen's internal control structure and control risk. As quickly became apparent during the Restatement process, Safety-Kleen's internal control weaknesses and deficiencies were pervasive. Indeed, soon after the Safety-Kleen Acquisition, during the initial conversion of accounting systems, Safety-Kleen missed its weekly payroll four times. In addition, problems encountered during that computer conversion caused the Company to be unable to match customer payments with accounts receivable.

267.    Despite this, PwC failed to expand the scope of its procedures adequately, and as a result, issued unqualified audit opinions on Safety-Kleen's financial statements when such statements materially overstated the Company's revenues, net income, earnings per share, assets, and stockholders' equity.

### PwC Failed to Obtain Sufficient Competent Evidential Matter

268.    GAAS provides that accounting data alone is insufficient to support an opinion on financial statements. (SAS Nos. 31 and 48, AU Section 326.16, SAS No. 1 Standard of Field Work). Before rendering an opinion on financial statements, the auditor must obtain sufficient, competent "evidential matter" to afford a reasonable basis for the opinion. (AU 326) "Evidential matter" consists of the underlying accounting data and all corroborating information available to the auditor. (AU Section 326.15.) Corroborating evidential matter includes both documentation obtained during the field work (e.g., checks, invoices, contracts, and independent confirmations) and information obtained from inquiry, observation, inspection and physical examination. (AU Section 326.17).

269.    Management's representations are not a valid substitute for the application of audit procedures to form a reasonable basis for an auditor's opinion of financial statements (SAS No. 19). An auditor must establish and perform a confirmation process with third parties to verify information utilized in the audit models (SAS No. 67). Where a random sampling audit reveals material discrepancies or errors, the audit procedures should be expanded to determine the magnitude of such errors, or the auditors should consider alternative procedures that would provide sufficient evidence to form a conclusion pursuant to Financial Accounting Standards Board Statement on Accounting Standards 31, 39.

270.    In the course of auditing Safety-Kleen's financial statements, PwC either knew or should have known facts which indicated that it had failed to obtain sufficient competent evidential matter to afford a reasonable basis in opining on Safety-Kleen's financial statements. PwC's staff was frequently present at Safety-Kleen corporate headquarters and had access to Safety-Kleen internal corporate books and records. In addition, PwC's staff had access to Safety-Kleen's private and confidential financial and business information. Despite the availability of such records and information, PwC failed to obtain, through inspection, observations, inquiries, confirmations and other audit procedures, sufficient competent evidential matter to afford a reasonable basis for its opinions on Safety-Kleen's financial statements. As a result, PwC issued unqualified opinions on Safety-Kleen's financial statements for 1997, 1998 and 1999 when such financial statements materially overstated the Company's revenues, net income, earnings per share, assets, and stockholder's equity.

271.    Since the accounting manipulations were effected by the use of numerous journal entries and adjustments, many of which were extremely large, occurred at the end of a period, and

-101-

were without any support or justification, an examination of those entries (as required by GAAS) would, by itself, have raised numerous red flags. PwC either failed to examine these entries or failed to make inquiries or obtain third party confirmation regarding the validity of those entries. In any event, PwC clearly failed to make any effort to obtain sufficient, competent corroborating data to support the entries as required by GAAS. (SAS Nos. 31, 48, and 80, AU Section 326.16.) Moreover, these entries were made personally by the Company's senior management, which constituted management overrides and a "reportable" violation of internal controls. (SAS # 82, AU Section 316).

272.    Additionally, PwC accepted at face value the adjustments that were made by management with regard to depreciation, adjustments to environmental reserves, and the capitalization of certain costs, all in violation of GAAP. PwC did not identify any significant industry studies or analyses performed by management to extend the useful lives of the fixed assets. They accepted the reduced closure costs associated with certain landfills in spite of the fact that many of these costs had been established by the Company's management pursuant to various acquisitions that occurred in the most recent prior years.

273.    PwC also accepted management's representations at face value on numerous issues, and neglected to confirm the accuracy of those representations with independent sources, even when doing so would have been very easy. For example, PwC accepted management's representations regarding the number and nature of its derivative transactions, without sending any confirmations to the counterparties to those transactions. Had PwC sent those confirmations, or even reviewed the actual derivative contracts entered into by the Company, it would have discovered that those derivative transactions actually increased, rather than decreased, the risk to

the Company. Instead of participating in "pure vanilla" interest rate swaps, as the Company represented in the disclosures to its financial statements, the Company was engaged in riskier transaction in which it took on greater risk in return for premium payments.

274.    Had PwC inspected the derivative contracts or sent confirmations, PwC also would have seen that the Company was receiving millions of dollars in premiums and cash termination settlements in connection with certain of these transactions and would have been required to investigate the Company's accounting treatment of those payments. PwC would have learned that the Company was in violation of GAAP by reporting the cash received in these transactions as top line revenue.

### PwC Improperly Issued Unqualified Audit Reports

275.    The Standards of Reporting under GAAS (SAS No.1, AU 150.02) provide the following with respect to independent auditors' reports:

>    (1)    The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

>    (2)    The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

>    (3)    Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

>    (4)    The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases, where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

276.     PwC issued unqualified audit opinions on the Company's fiscal 1997, 1998 and 1999 financial statements, falsely stating that those financial statements had been prepared in accordance with GAAP. PwC's audit reports failed to identify circumstances in which GAAP had not been consistently observed in relation to prior periods, including for example the Company's failure to apply a consistent approach to the timing of revenue recognition.

277.     PwC's reports did not disclose any deficiencies in the informative disclosures contained in the financial statements. A number of those disclosures were inadequate. For example, the Company's extension of its assets' useful lives was a change in accounting estimates for which disclosure was required to be made, but was not. In addition, the informative disclosures regarding derivative transactions were inadequate and, indeed, false. Without taking the necessary audit steps to confirm the disposition of money received by the Company from derivative transactions, PwC accepted the Company's explanation that differentials paid as received were being treated as adjustments to interest expense when, in fact, the Company was additionally receiving substantial premiums and cash termination settlements which were being included in top line revenue. PwC failed to take the necessary steps to assure itself that the so called "informative disclosures" upon which it was opining were true and accurate, and instead issued an unqualified opinion that the financial statements were presented in accordance with GAAP when they were not.

278.     PwC substantially departed from compliance with GAAS by issuing unqualified audit opinions when it had knowledge of material errors and irregularities in the Company's financial statements, and when its auditing procedures had been performed so recklessly as to amount to no audit at all. PwC was required under GAAS to (1) revise the financial statements,

-104-

(2) issue a qualified or adverse opinion, or (3) withdraw from the audit and notify the SEC. PwC

did none of these, contrary to GAAS.

## THE AUDIT COMMITTEE FAILED IN ITS DUTIES

279.    The Audit Committee's responsibilities were set forth in a charter which was

adopted by the Board and disclosed to investors. The charter required the Audit Committee to,

among other things:

   a.    review and assess the effectiveness of management's policies and practices
         concerning financial reporting;

   b.    question management and the external auditor regarding significant
         financial reporting issues and the method of resolution;

   c.    review general accounting trends and issues of auditing policies, standards
         and practices, which affect or may affect the company;

   d.    review with management and the external auditor any proposed changes in
         major accounting policies, the presentation and impact of significant risks
         and uncertainties and key estimates and judgments of management that may
         be material to financial reporting;

   e.    perform analytical procedures, such as review, comparison, inquiry and
         discussion with management to obtain adequate explanations for all
         significant variances and balances and financial ratios between actual
         results of comparative periods and budgeted results for the period being
         reviewed;

   f.    review and monitor management's internal control procedures, programs
         and policies and assess the adequacy and effectiveness of internal controls
         over the accounting and financial reporting systems within the company,
         with particular emphasis on controls over computerized systems;

   g.    review the audit plans of the internal and external auditors with
         management including the degree of coordination in those plans and make
         inquiry as to the extent to which the planned audit scope can be relied upon
         to detect weaknesses in internal control or fraud or other illegal acts;

       h.      review any problems experienced by the external auditor in performing the audit, including any restrictions imposed by management or significant accounting issues on which there was a disagreement with management; and

       i.       review such litigation, claims, transactions or other contingencies as the internal auditor, external auditor or any officer of the company may bring to its attention.

280.    Rather than perform these functions in an independent manner, the Audit Committee relied completely on PwC to tell them what they needed to know. Thus, although investors were led to believe that the Company had a functional audit committee that would serve as an independent "check and balance" on management and PwC, the Audit Committee added no real value to the process of ensuring the accuracy of the Company's financial reporting.

281.    Even when PwC brought violations of GAAP to the Audit Committee's attention in the form of SUDs, and informed the Audit Committee that management had refused to make PwC's proposed adjustments, the Audit Committee did nothing. The Audit Committee never questioned management about those items, and never required that any of PwC's proposed adjustments be made. The Audit Committee also never considered whether there were additional errors, beyond those on the SUD, that PwC had failed to detect.

282.    The Audit Committee's failure to require any of the adjustments on the SUDs was based on PwC's assurances that the errors were not material, and that PwC would issue an unqualified audit opinion even if they were not corrected. The Audit Committee members never inquired as to why PwC believed the errors were not material, and never did any analysis of their own of the materiality of those errors, despite having been informed by PwC that its "rule of thumb" for determining materiality to the income statement was 5%. In fact, the errors on the

SUDs were material each year. The Audit Committee members had all of the information necessary to make that determination, had they bothered to make the effort.

283.    In addition, as alleged herein, the Audit Committee overrode the advice of PwC by insisting upon the recording of a $65 million restructuring charge in the third quarter of fiscal 1998, despite being told by PwC that they did not approve of the charge.

284.    The Audit Committee also did nothing to independently monitor the progress of the integration of the computer systems following the Safety-Kleen Acquisition, despite knowing that those systems were a critical element of the Company's internal controls, as well as a key to the achievement of cost savings in the merger. The person in charge of the Company's computer systems was never asked to make a report to the Audit Committee, and the Audit Committee never got any information directly from the people in the field regarding the adequacy of controls over computerized systems. Instead, they relied completely on PwC to monitor the integration of those systems, and the internal controls in general.

285.    The Audit Committee members were severely reckless in failing to fulfill their obligations, and in approving financial statements for each fiscal year that contained material false statements.

## FRAUD CREATED THE MARKET FOR THE BONDS

286.    If it were not for the false and misleading statements in the Company's financial statements, the Company could not have issued the Bonds. Several of the directors who approved the issuance of the Bonds, including Tippie, have admitted that they would not have done so if they had known the Company's true financial condition.

287.    But for Defendants' fraud, there would have been no viable market for the Bonds. Therefore, fraud created the market for the Bonds.

## THE MARKET FOR THE BONDS

288.    At all relevant times, the market for the Bonds was an efficient market wherein all current and publicly available information with respect to the Company was reflected in the prices at which Plaintiff and other investors bought and sold the Bonds. Plaintiff relied on the integrity of the market price of the Bonds.

289.    News stories regarding Safety-Kleen were reported in numerous widely-published sources, including The Wall Street Journal, Dow Jones News Service, Business Wire, PR Newswire, and Bloomberg.

290.    Safety-Kleen was consistently covered by securities analysts from at least 19 financial institutions, including many major brokerage houses. Among the institutions that issued investment reports or commentary on Safety-Kleen to the public were TD Securities, Bear Stearns & Company, CIBC World Markets, Goldman Sachs, Smith Barney, Merrill Lynch, Credit Suisse First Boston, Lehman Brothers, DLJ Securities, Deutsche Bank Securities, Raymond James & Associates, RBC Capital Market, Daewoo Securities, Renaissance Capital, Ford Investor Service, Instinet Corp., Laguna Research, Standard & Poors, Nesbitt Burns.

291.    The market for the Bonds was primarily an institutional market. The vast majority of the trading in the Bonds was accomplished by institutional investors and professional investment managers, including TCW, who kept themselves fully apprised of publicly available information relating to the Bonds.

-108-

292.    At least 9 dealers, including several major brokerage houses, made a market in the Bonds. These included TD Securities, NationsBanc Montgomery Securities, Goldman Sachs, Bear Stearns & Company, Inc., Deutsche Bank, RBC Dominion, Grantchester, Miller Tabak Roberts, and Imperial Capital.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS PROXIMATELY CAUSED PLAINTIFF'S DAMAGES

293.    A corporate bond represents a debt owed by the issuer of the bond to the holder of the bond. A primary determinant of the price of a bond is the market's perception of the likelihood of default on the bond.

294.    The publication of materially false information regarding the Company's financial condition and results caused investors and the marketplace to underestimate the probability of default on the Bonds. The Company led investors to believe that there was only a modest risk of default, when in fact that risk was substantial. As a result, the Bond prices were artificially inflated at all times prior to March 6, 2000.

295.    TCW was induced to purchase Bonds on behalf of Plaintiff by Defendants' false statements alleged herein, including false historical financial statements which painted an inaccurate picture of the Company's ability to service its debt. If TCW had known the Company's true financial condition, it would have known that the risk of default on the Bonds was significantly higher than represented, and it would not have purchased the Bonds on behalf of Plaintiff.

-109-

296.     At the time Plaintiff purchased the Bonds, neither Plaintiff nor TCW had knowledge of the wrongful conduct alleged herein, or of the information misrepresented or withheld by Defendants, and they could not reasonably have discovered such information.

297.     The Company's March 2000 revelations of accounting irregularities, of the withdrawal of PwC's audit opinions, and of the need to restate the Company's prior financial statements immediately increased the perceived probability of default on the Bonds, causing the price of the Bonds to drop precipitously, and causing damage to Plaintiff.

298.     The Defendants' publication of false financial information, including in the Company's Forms 10-K, Offering Memoranda, and Registration Statements, was a substantial factor in causing Plaintiff's injury.

## TOLLING OF THE STATUTE OF LIMITATIONS

299.     The statutes of limitations on Plaintiff's claims began to run no earlier than March 6, 2000. Prior to that date, Plaintiff did not know and could not have reasonably discovered the facts giving rise to its claims.

300.     On April 13, 2000, a class action was filed on behalf of all purchasers of Safety-Kleen securities, including the Bonds. That action was subsequently consolidated with another class action filed on July 12, 2000 on behalf of Bond purchasers. On January 8, 2003, a class was certified in the class action, consisting of all those who purchased or acquired 2008 Bonds or 2009 Bonds between April 17, 1998 and March 9, 2000. Subsequently, by order dated October 29, 2004, the class was decertified with respect to the claims under Sections 10(b), Section 18 and Section 20(a) of the Securities Exchange Act of 1934.

301.    By order of the Court, the effect of the decertification order in the class action was stayed, and the statutes of limitations on the individual claims of Plaintiff and other class members were tolled, until thirty days after the filing of an affidavit confirming that notice of the decertification order had been mailed to the class.  That affidavit was filed on December 23, 2004, making January 22, 2005 the effective date of the decertification order.

302.    The statutes of limitations on all of the claims asserted in Plaintiff's complaint were tolled from the time the class action was filed until January 22, 2005.

303.    All of Plaintiff's claims have been brought within the applicable statutes of limitations, after giving effect to tolling.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Bullock, Winger, Humphreys and Bragagnolo

304.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

305.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants Bullock, Winger, Humphreys, and Bragagnolo.

306.    Defendants Bullock, Winger, Humphreys, and Bragagnolo, as senior officers and/or directors of the Company, individually and collectively were responsible for, among other things, the Company's financial accounting system, the Company's system of internal controls, and the preparation and review of the audited and unaudited financial statements prepared and published in the name of the Company and contained in reports and other documents, including those filed with the SEC.

-111-

307.    Defendants Winger and Humphreys were instrumental in the preparation and dissemination of the Company's public financial statements. Each of them, as well as defendant Bullock, approved the Company's financial statements, the Registration Statements and Offering Memoranda relating to the Bonds, and the Company's Forms 10-K and other SEC filings. In addition, each of them signed the Registration Statements and Forms 10-K. As alleged herein, all of those documents contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements therein not misleading. The Company's fiscal 1997, fiscal 1998 and fiscal 1999 audited financial statements have been withdrawn and restated by material amounts. Thus, those financial statements and management's discussion thereof were all materially false when issued (see Accounting Principles Board Opinion No. 20).

308.    As detailed in preceding paragraphs, the Company's accounting practices were manipulated in a variety of ways in order to overstate the Company's financial results. Each of Defendants Bullock, Winger, Humphreys and Bragagnolo had actual knowledge of material misstatements in each year's financial statements. Winger and Humphreys had such knowledge by virtue of their participation in, and express direction of, the accounting manipulations that led to the misstatements. Bullock had such knowledge by virtue of his position as Chairman of the Board, his relationships with Winger, Humphreys, and Haworth, and the pressure which he exerted upon the Company's management to meet earnings expectations at all costs. Bragagnolo had such knowledge because he was aware that the Company's published financial statements were materially different from, and indeed more favorable than, the Company's internal financial statements.

309.    The accounting manipulations were undertaken personally by, and/or under the express direction of, Defendants Winger, Humphreys, and Bullock, who were each fully aware of the manipulations and their material impact on the Company's financial statements. These Defendants, together with Defendant Haworth, were the source of most, if not all, of the Company's irregular accounting practices.

310.    The accounting manipulations alleged herein were undertaken, in part, because Safety-Kleen's actual financial results were falling short of expectations following the Safety-Kleen Acquisition. Defendants Winger, Humphreys, Bullock and Bragagnolo (all of whom had served as executive officers and/or directors of LES) had expected to be able to increase the Company's future reported earnings through the achievement of significant costs savings and synergies, and by reducing Old Safety-Kleen's environmental reserves – which they believed were conservative -- and adding the amount of the reduction to reported income. However, upon assuming their senior management roles with the new Safety-Kleen, these Defendants found that they could not report increasing revenues or meet analysts' earnings estimates without cooking the books.

311.    Defendants Winger, Humphreys, and Bragagnolo had a clear incentive to inflate the Company's financial results, and hence the price of its securities, because their ability to maintain their positions at Safety-Kleen and receive increased remuneration depended on their ability to have Safety-Kleen succeed. For example, the Company's Executive Bonus Plan (the "Plan") provided for bonuses to executive officers and key employees of the Company and its subsidiaries which were directly related to the publicly reported financial results of the Company, based upon one or more of the following criteria:

-113-

     (1)     earnings per share;
     (2)     net income;
     (3)     stock price;
     (4)     operating profit;
     (5)     earnings before interest, taxes, depreciation and amortization ("EBITDA");
     (6)     return on assets;
     (7)     total shareholder return;
     (8)     level of fixed or variable costs; and
     (9)     quantity of waste managed.

The Company's executive officers were also eligible to receive additional cash compensation under an annual management incentive plan ("MIP"), based upon, *inter alia*, the Company's publicly reported financial performance during the last fiscal year as measured by earnings per share. All of this compensation was in addition to the executive officers' salaries and stock options, which were granted annually and were designed to provide an incentive for those primarily responsible for the growth and success of the Company.

312.    Defendant Bullock also had a clear incentive to inflate the Company's financial results because, as an executive officer of Laidlaw, he was subject to a similar bonus plan to the Plan at Safety-Kleen, and improved reported financial performance at the Company led to increases in his bonuses.

313.    Defendants Bullock, Winger, Humphreys and Bragagnolo knew, or were reckless in not knowing, that the Company's reported financial results and other public statements were materially false and misleading as a result of the accounting manipulations alleged herein, and therefore knew or were reckless in not knowing of the falsity of the Registration Statements and Offering Memoranda for the Bonds, as well as the Company's Forms 10-K and other SEC filings and press releases.

-114-

314.   Defendants Bullock, Winger, Humphreys, and Bragagnolo knew, or were reckless in not knowing, that the Company's system of internal controls was ineffective.

315.   Each of Defendants Bullock, Winger, Humphreys, and Bragagnolo was a Director and/or an executive officer of the Company who had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of the Company, including the content and dissemination of the financial statements, public filings and other public statements which Plaintiff contends are false and misleading. These Defendants were provided with or had unlimited access to copies of the reports, press releases, public filings, financial statements and other statements alleged by Plaintiff to be false and misleading prior to and/or shortly after these statements were issued or publicly disseminated and had the ability to prevent their issuance or public dissemination or cause the statements to be corrected.

316.   Winger, Humphreys and Bragagnolo, as executive officers of the Company, had direct and supervisory involvement in and controlled the Company's day-to-day operations. Bullock was directly involved through his role as Chairman of the Board and CEO of the Company's largest shareholder.

317.   Winger, Humphreys, Bragagnolo and Bullock acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

318.   The materially false and misleading statements by these Defendants were made in connection with the purchases of the Bonds by Plaintiff.

319.   By virtue of an investment management agreement between Plaintiff and TCW, TCW made the investment decisions on behalf of Plaintiff. As a result, reliance by TCW constitutes reliance by Plaintiff.

-115-

320.    Plaintiff and TCW relied on the materially false and misleading statements of these

Defendants and the Company in purchasing the Bonds.   In particular, before purchasing Bonds on

behalf of Plaintiff, TCW read and relied on the Company's most-recently published audited

financial statements, as well as subsequent quarterly financial statements.  TCW also relied on the

written materials and oral statements from the LES Road Show.

321.    These materially false and misleading statements proximately caused Plaintiff to

purchase the Bonds and thereby proximately caused Plaintiff to suffer damages.

322.    At the time Plaintiff purchased the Bonds, neither Plaintiff nor TCW knew of any

of the false and/or misleading statements and omissions.

323.    The fraudulent activity alleged in this Count constituted a manipulative or

deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or

artifice to defraud, prohibited by Rule 10b-5.

## COUNT II

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against Tippie and Wareham

324.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs

as if fully set forth herein.

325.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder against Defendants Tippie and Wareham

326.    As alleged herein, the Company's public financial statements for fiscal 1997, fiscal

1998, and fiscal 1999, as contained in the Registration Statements and Offering Memoranda

relating to the 2008 and 2009 Bonds and in the Company's Forms 10-K and other SEC filings,

-116-

contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements therein not misleading. Tippie and Wareham approved each of these financial statements and filings, and signed the Registration Statements and Forms 10-K. Tippie and Wareham have admitted that these financial statements and filings were materially false.

327.    Defendants Tippie and Wareham were directors of the Company and served on the Audit Committee of the Board. As members of the Company's Audit Committee, these defendants were responsible for fully understanding the Company's accounting policies, procedures and internal control systems, and were in direct contact with the Company's auditors. They also had the authority and duty to oversee, review and examine statements made in the name of the Company contained in reports and other documents, including financial statements filed with the SEC, and to be certain that the Company's financial condition was reported in a fair and accurate manner.

328.    By virtue of their positions as directors and Audit Committee members, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the accounting and financial reporting processes of the Company, including the content and dissemination of the financial statements and public filings which Plaintiff contends are false and misleading.

329.    Tippie and Wareham were aware of the Company's accounting procedures and knew, or were reckless in not knowing, that those procedures were not in keeping with industry standards or GAAP. They also knew, or were reckless in not knowing, that utilizing these

-117-

irregular accounting procedures would result in the Company's financial statements being materially false and misleading and not being prepared in accordance with GAAP.

330.    As detailed in preceding paragraphs, the Company, through its directors and officers, manipulated the Company's accounting practices in order to misstate the Company's financial results. Tippie and Wareham knew facts and had access to information indicating that the Company's accounting did not comply with GAAP, and that its financial statements were materially false. For example, they were presented with statements of unadjusted differences each year which showed that the financial statements failed to comply with GAAP in numerous respects, and that they were materially misstated.

331.    Other accounting manipulations were so egregious, and the resulting misstatements so significant, that the members of the Audit Committee were grossly reckless in failing to detect them. For example, at the time the Company was engaging in improper derivative transactions (and improperly accounting for such transactions), the subject of derivatives was a "hot topic" in the financial and business communities. It was well known at that time that a number of companies had been encouraged by their bankers to invest in derivatives that were riskier than they were led to believe. Any reasonably diligent business person would have known of the potential problems associated with derivatives, and would have taken steps to assure themselves of the propriety and advisability of their company's derivative investments. Defendants Tippie and Wareham were, at a minimum, grossly reckless in failing to do so.

332.    Moreover, each of these defendants, as members of the Audit Committee, was grossly reckless because they relied entirely on PwC to evaluate the Company's internal controls

and the accuracy of the Company's financial reporting, without taking any steps to ensure that such reliance was reasonable.

333.    Defendants Tippie and Wareham acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

334.    The materially false and misleading statements by these Defendants were made in connection with the purchases of the Bonds by Plaintiff.

335.    By virtue of an agreement between Plaintiff and TCW, TCW made the investment decisions on behalf of Plaintiff.  As a result, reliance by TCW constitutes reliance by Plaintiff.

336.    Plaintiff and TCW relied on the materially false and misleading statements of these Defendants and the Company in purchasing the Bonds.  In particular, before purchasing Bonds on behalf of Plaintiff, TCW read and relied on the Company's most-recently published audited financial statements, as well as subsequent quarterly financial statements.

337.    These materially false and misleading statements proximately caused Plaintiff to purchase the Bonds and thereby proximately caused Plaintiff to suffer damages.

338.    At the time Plaintiff purchased the Bonds, neither Plaintiff nor TCW knew of any of the false and/or misleading statements and omissions.

339.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT III

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against PwC

340.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

341.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against PwC.

342.    As "independent" auditors of the Company and Services, PwC had a duty to examine the Company's and Services' financial statements in accordance with GAAS to determine, among other things, whether the financials were presented in accordance with GAAP. Further, in connection therewith, PwC had a duty to disclose to management, and in particular the Audit Committee, any defects in the system of internal controls.

343.    As alleged herein, the Company's public financial statements for fiscal 1997, fiscal 1998 and fiscal 1999, which were audited by PwC, were materially false and misleading.  These financial statements, which were contained within the Registration Statements and Prospectuses relating to the 2008 and 2009 Bonds, and/or in the Company's other SEC filings, including its Form 10-K filings, contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements therein not misleading.  The Company's fiscal 1997, 1998 and 1999 audited financial statements have been withdrawn and restated by material amounts.  Thus, those financial statements and management's discussion thereof were all materially false when issued (see Accounting Principles Board Opinion No. 20).

-120-

344.    PwC's unqualified audit opinions with respect to the Company's fiscal 1997, 1998 and 1999 financial statements were materially false and misleading, in that they falsely represented that PwC had audited the financial statements in accordance with GAAS and that the financial statements presented fairly, in all material respects, the Company's financial position at each respective fiscal year-end and the results of its operations and cash flows for each of those years in conformity with GAAP.

345.    Inasmuch as Safety-Kleen was a public company, PwC knew and understood that its reports concerning the Company's financial statements would be distributed to the investing public, and that investors would rely and had a right to rely on such reports. PwC knew and understood that its audit opinions would be included in and constituted material parts of the Company's annual reports on Form 10-K filed with the SEC. PwC consented to the inclusion of its audit opinions in the Offering Memoranda, and to being named in the Registration Statements as a party who had certified the financial statements contained therein. PwC understood that a primary intent of the Company was for PwC's professional services to influence potential purchasers of the Bonds.

346.    In auditing the Company's financial statements, PwC disregarded, in violation of GAAS, glaring irregularities in the Company's books and records and system of internal controls. PwC falsely represented to investors that it had audited the Company's financials in accordance with GAAS and that the Company's financial statements were presented in accordance with GAAP when it issued unqualified audit opinions in connection with the Company's financial statements.

347.    PwC's actions in disregarding these glaring irregularities, holding out to the public and the SEC that it had conducted the audits in accordance with GAAS, and certifying the Company's financial statements as prepared in accordance with GAAP, were intentional or, at a minimum, reckless.

348.    By virtue of its position as independent auditor of Safety-Kleen, PwC had access to key employees of the Company and continual access to and knowledge of Safety-Kleen's confidential corporate, financial, operating, and business information at all relevant times. As a result of the auditing services it provided to Safety-Kleen, PwC personnel were frequently present at Safety-Kleen's corporate headquarters throughout each year. PwC knew or recklessly disregarded Safety-Kleen's true financial and operating condition, and intentionally or recklessly failed to take steps which, as Safety-Kleen's auditor, it could and should have taken to fully and fairly disclose the true facts to the public.

349.    PwC made or caused to be made statements contained in reports and other documents the Company filed with the SEC which were, at the time and in light of the circumstances under which they were made, false and misleading with respect to material facts. PwC falsely represented that it had audited the Company's financials in accordance with GAAS, when in fact its audits had not complied with GAAS. PwC also falsely certified the Company's annual financial statements for fiscal 1997, 1998 and 1999 as having been prepared in accordance with GAAP, when it knew or reckless failed to know that these reports contained statements that were materially false and misleading.

350.    PwC knew or was reckless in not knowing that the Company had no factual basis or justification for the accounting practices alleged herein. Nevertheless, PwC continued to

certify financial statements whose accuracy was dependent, in material part, on these accounting practices.

351.    At all relevant times, PwC knew that the Company was investing in derivatives. PwC also knew, or should have known based on the plethora of accounting literature and discussion that was circulating about derivatives at that time, that derivatives were a subject that was ripe for controversy and were causing problems for many companies. Despite this, and despite having assured the Audit Committee that it would do so, PwC intentionally failed to send confirmations to the counterparties on the Company's derivatives, or to request or review any of the Company's derivative contracts or transactions during the course of its audits. PwC therefore knew it had no factual basis on which to judge the propriety of those transactions or the Company's accounting therefor. Nonetheless, PwC certified the Company's financial statements, which contained notes regarding the Company's derivative transactions. By doing so, PwC intentionally or, at a minimum recklessly, misled investors to believe that it had reviewed the Company's derivative transactions and the accounting therefor, and was satisfied that they were in compliance with GAAP.

352.    In sum, PwC either knew or recklessly disregarded the facts which indicated that the Company's financial statements were materially false and misleading, and issued unqualified opinions on the Company's fiscal 1997, 1998 and 1999 financial statements when such financial statements materially overstated the Company's revenues, net income, earnings, total assets and stockholders' equity.

353.    PwC's scienter is further evidenced by the magnitude by which the Company's financial results were misstated in its financial statements:  more than $500 million over three

-123-

years. Absent intentional or reckless conduct, PwC would have detected these misstatements during the course of its audits and either taken corrective action or declined to issue unqualified audit opinions.

354. PwC also had motive and opportunity to commit the fraud alleged herein. PwC audited the Company's financial statements and issued audit opinions which it knew would be disseminated to, and relied upon by, investors. Thus it had the opportunity to commit fraud. PwC's motive derives from its longstanding relationships with Safety-Kleen, Services, Laidlaw and TD Securities, and the fact that it might destroy those relationships, and the lucrative fees derived therefrom, if it failed to issue unqualified opinions or if it otherwise blew the whistle on the fraud occurring at Safety-Kleen.

355. PwC acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

356. The materially false and misleading statements by PwC were made in connection with the purchases of the Bonds by Plaintiff.

357. By virtue of an agreement between Plaintiff and TCW, TCW made the investment decisions on behalf of Plaintiff. As a result, reliance by TCW constitutes reliance by Plaintiff.

358. Plaintiff and TCW relied on PwC's materially false and misleading statements in purchasing the Bonds. In particular, before purchasing Bonds on behalf of Plaintiff, TCW read and relied on the Company's most-recently published audited financial statements, including PwC's audit opinions thereon.

359. These materially false and misleading statements proximately caused Plaintiff to purchase the Bonds and thereby proximately caused Plaintiff to suffer damages.

360.    At the time Plaintiff purchased the Bonds, neither Plaintiff nor TCW knew of any of the false and/or misleading statements and omissions.

361.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT IV

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against TD Securities

362.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

363.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against TD Securities.

364.    TD Securities made materially false and misleading statements alleged herein.  In particular, it prepared the Road Show materials and played a central role in the preparation of the Offering Memoranda and the Registration Statements.  TD Securities drafted the section of the Offering Memoranda that described the Bonds, and attended numerous drafting sessions where the balance of the Offering Memorand were reviewed, discussed, and edited.  TD Securities' name also appeared on the cover page of each Offering Memorandum.  As TD Securities knew and expected, the Offering Memoranda were then used as the bases for the Registration Statements, and the Offering Memoranda and Registration Statement for each series of Bonds were nearly identical in content.  TD Securities also introduced the Company's management to

TCW at the LES Road Show, then failed to correct materially false and misleading statements made by management during the road show.

365.    In addition to making false and misleading statements, TD Securities engaged in other acts which operated as a fraud or deceit upon Plaintiff, in violation of Rule 10b-5(a) and (c). As alleged herein, TD Securities played a central role in the marketing, offering and sale of the Bonds, including taking the lead in due diligence, identifying and contacting potential investors, arranging the Road Show presentations and inviting investors to attend, preparing the Road Show materials, working with management to prepare presentations to rating agencies, and getting the Bonds designated as PORTAL securities by the National Association of Securities Dealers so they could be traded in the secondary market.  TD's activities related to the Company's derivative transactions, including arranging transactions which were not for hedging purposes, which violated the Company's loan covenants, and which were used by the Company to inflate its reported revenues, were also acts in violation of Rule 10b-5(a) and (c).

366.    TD Securities had the obligation as a lead underwriter for Safety-Kleen and Services securities to perform adequate due diligence in order to assure itself that the information in the Offering Memoranda and Registration Statements was true and accurate.  Had it fulfilled its obligation to perform adequate due diligence, TD Securities would have known that information in the Offering Memoranda and Registration Statements was, in material respects, false and misleading.

367.    TD Securities knew, or should have known, that prospective purchasers of the Bonds, such as Plaintiff, were relying on them to perform the required due diligence.

-126-

368.    As a result of its longstanding relationships with the Company and the nature of the underwriting, financial advisory and analyst services rendered to the Company, TD Securities' personnel were regularly present at the Company's corporate headquarters throughout the relevant time period and had continual access to, and knowledge of, the Company's confidential corporate financial and business information through conversations with Company employees and review of the Company's non-public documents.  However, rather than conduct any independent review or analysis of such critical matters as the Company's asset valuation, the quality of its receivables, its derivatives activity, its financial data, or the Company's achievement of synergies in its acquisitions, TD Securities' "due diligence" in those areas consisted solely of reliance on representations by management.  TD Securities therefore knew of or recklessly disregarded the adverse facts concerning the Company that led to the withdrawal of the Company's financial statements and rendered those statements materially misleading when issued.

369.    Despite being a lender and administrative agent on the Senior Credit Facility which required the Company to enter into non-speculative derivative transactions, and despite arranging numerous derivative transactions for the Company, including several that were generated substantial cash payments for the Company and were not for purposes of interest rate hedging, TD Securities did nothing to ensure the Company's compliance with the derivatives-related covenants in its Senior Credit Facility.  Nor did TD Securities do any due diligence relating to derivatives during the Bond offering process.  TD Securities either knew or recklessly failed to discover that the Company was engaged in speculative derivative transactions and that it was not accurately disclosing its derivatives activity in its financial statements or public filings.

-127-

370.    TD Securities intentionally, or at least recklessly, failed to fulfill its due diligence obligations. TD Securities either knew about the material misstatements and omissions in the Offering Memoranda and Registration Statements but failed to disclose them, or it failed to do even the most basic due diligence, recklessly failed to discover these misstatements and omissions, and lied about the due diligence actually performed.

371.    Nonetheless, TD Securities marketed and sold the 2008 and 2009 Bonds, trumpeting the Company's successes at road shows and in other venues, and recommended that investors purchase those Bonds, with knowledge of or in reckless disregard of the fact that the Company's public filings were materially false and misleading.

372.    TD Securities acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein, and in engaging in the other acts which operated as a fraud or deceit upon Plaintiff.

373.    In addition to serving as lead underwriter for the Bonds, TD Securities provided financial advisory services to the Company, and its analysts regularly covered the Company. An affiliate of TD Securities also served as the Company's and Services' primary banking institution, and affiliates of TD Securities were lenders under the Senior Credit Facility and counterparties to the Company in derivative transactions. At all relevant times, the Company and Laidlaw were major clients of TD Securities, and at times the Company was TD Securities' single largest client. TD Securities was paid tens of millions of dollars for its underwriting and financial advisory work which depended on the successful offering and sale of the 2008 and 2009 Bonds. TD Securities therefore had a motive to commit the fraud alleged herein, since it had an interest in preserving its relationships with the Company, Services and Laidlaw.

374.    TD Securities was also motivated to commit fraud in connection with the sale of the 2008 Bonds, because the proceeds of that sale were to be used to repay hundreds of millions of dollars of the Senior Credit Facility which had been extended to Services by affiliates of TD Securities and other lenders.  By failing to disclose the accounting manipulations that were occurring at Safety-Kleen, TD Securities helped create a market for the 2008 Bonds.  According to the 1998 Offering Memorandum, the sale of the 2008 Bonds was expected to generate $291 million in proceeds, all of which would be used to repay the lenders under the Senior Credit Facility, which included affiliates of TD Securities.

375.    TD Securities had the opportunity to commit fraud in connection with the sale of the Bonds, by virtue of its position as lead underwriter, its participation in the preparation of the Offering Memoranda, and its participation in the LES Road Show.

376.    TD Securities' scienter is further evidenced by the magnitude by which the Company's financial results were misstated in its financial statements:  more than $500 million over three years.  Absent intentional or reckless conduct, TD Securities would have detected these misstatements during the course of its due diligence and informed the investing public.

377.    The materially false and misleading statements by TD Securities, and the other acts by TD Securities which operated as a fraud or deceit upon Plaintiff, as alleged herein, were made in connection with the offering and sale of the Bonds.

378.    By virtue of an agreement between Plaintiff and TCW, TCW made the investment decisions on behalf of Plaintiff.  As a result, reliance by TCW constitutes reliance by Plaintiff.

379.    Plaintiff and TCW relied on the materially false and misleading statements in purchasing the Bonds.  In particular, before purchasing Bonds on behalf of Plaintiff, TCW read

-129-

and relied on the Offering Memoranda issued in connection with the marketing and sale of the 2008 and 2009 Bonds and the financial statements contained in and made a part those documents. TCW also relied on the financial advisory and underwriting work of TD Securities, and on the statements by Company management at the LES Road Show, which TD Securities adopted and failed to correct, that the Company was a growing and thriving company with solid cash flow and earnings, and which was able to service its debt and financial obligations.

380.    These materially false and misleading statements, and TD Securities' fraudulent and deceitful acts, proximately caused Plaintiff to purchase the Bonds and thereby proximately caused Plaintiff to suffer damages.

381.    At the time Plaintiff purchased the Bonds, neither Plaintiff nor TCW knew of any of the false and/or misleading statements and omissions.

382.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

### COUNT V

### Violation of Section 18 of the Exchange Act
### Against Bullock, Haworth, Tippie, Wareham, Winger, and Humphreys

383.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

384.    This claim is brought pursuant to Section 18 of the Exchange Act against Bullock, Haworth, Tippie, Wareham, Winger, and Humphreys.

385.    As set forth above, these Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC.  Specifically, the Company's audited financial statements for fiscal 1997, fiscal 1998 and fiscal 1999 were included in the Company's Forms 10-K that were filed with the SEC.  Those financial statements were later withdrawn and restated by material amounts, which by way of definition (see Accounting Principles Board Opinion No. 20) makes them false and misleading.

386.    By virtue of an agreement between Plaintiff and TCW, TCW made the investment decisions on behalf of Plaintiff.  As a result, reliance by TCW constitutes reliance by Plaintiff.

387.    TCW read the false and misleading statements of the Company's financial condition in the 1998 10-K that was filed by the Company with the SEC, and relied upon those statements when deciding to purchase Bonds on behalf of Plaintiff, not knowing that they were false and misleading.  This reliance was reasonable, particularly given the clean audit opinion from the Company's auditor, PwC.

388.    Each of Bullock, Haworth, Tippie, Wareham, Winger, and Humphreys signed the Company's Forms 10-K for fiscal 1997, fiscal 1998 and fiscal 1999.

389.    When the truth was finally revealed about the false and misleading statements in the Company's documents and reports filed with the SEC, including the existence of accounting irregularities, Plaintiff was significantly damaged by the resulting drop in the value of the Company's Bonds.

390.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damage in connection with its purchases of Bonds.

391.    By virtue of the foregoing, Defendants Bullock, Haworth, Tippie, Wareham, Winger, and Humphreys have violated Section 18 of the Exchange Act.

## COUNT VI

### Violation of Section 20(a) of The Exchange Act
### Against Bullock, Haworth, Tippie, Wareham, Winger, Humphreys, and Bragagnolo

392.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

393.    This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), against Bullock, Haworth, Tippie, Wareham, Winger, Humphreys, and Bragagnolo.

394.    Although the Company is not a party, nor is Plaintiff asserting claims against the Company in this action, the Company committed primary violations of Sections 10(b) and 18 of the Exchange Act, and Rule 10b-5 promulgated by the SEC, by making false and misleading statements of material fact in connection with the purchase and sale of securities, including false and misleading statements in Forms 10-K and other documents filed with the SEC, which were relied upon by Plaintiff to its detriment (as described herein).  At the time these false and misleading statements statements were made, the Company knew, or was reckless in not knowing, of their falsity.

395.    Defendants Bullock, Haworth, Tippie, Wareham, Winger, Humphreys, and Bragagnolo controlled the Company within the meaning of Section 20(a) of the Exchange Act. Bullock was Chairman of the Board of the Company as well as Chief Executive Officer of the Company's largest stockholder, Laidlaw; Haworth was a director and Chairman of the Audit Committee of the Company, as well as Chief Financial Officer of Laidlaw; Tippie was a director

of the Company, and took over for Haworth as Chairman of the Audit Committee in March 1999; Wareham was a director and member of the Audit Committee of the Company; Winger was a director and Chief Executive Officer of the Company; Humphreys was Chief Financial Officer of the Company; and Bragagnolo was Chief Operating Officer of the Company.

396.    By virtue of their high level positions with the Company, their participation on the Audit Committee, and their participation in and/or awareness of the Company's finances and operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to investors (including Plaintiff), these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of the Company, including the content and dissemination of the financial statements, public filings and other statements which Plaintiff contends are false and misleading.  These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, financial statements and other statements alleged by Plaintiff to be false and misleading prior to and/or shortly after these statements were issued or publicly disseminated and had the ability to prevent their issuance or public dissemination or cause the statements to be corrected.

397.    In particular, Winger, Humphreys and Bragagnolo, as executive officers of the Company, had direct and supervisory involvement in and controlled the Company's day-to-day operations; Bullock was directly involved through his role as Chairman of the Board; and Haworth, Tippie and Wareham were intimately involved with and controlled the Company's accounting and its financial reporting through their service on the Audit Committee of the Board.

-133-

398.    By virtue of their positions as controlling persons, Bullock, Haworth, Tippie, Wareham, Winger, Humphreys, and Bragagnolo are liable pursuant to Section 20(a) of the Exchange Act.

399.    Bullock, Haworth, Tippie, Wareham, Winger, Humphreys, and Bragagnolo each had knowledge of or reasonable ground to believe that the Company's financial statements contained untrue statements of material fact and/or omitted material facts required to be stated therein to make them not misleading, and each was at least reckless in allowing those financial statements to be published without being corrected.

400.    At the time Plaintiff purchased the Bonds, neither Plaintiff nor TCW knew of any of the Company's false and/or misleading statements and omissions, and they relied on the Company's public financial statements and other statements regarding its financial condition, including the Company's Form 10-K filings, as alleged herein.

401.    As a direct and proximate result of the wrongful conduct of these Defendants and the Company, Plaintiff suffered damages.

## COUNT VII

### Common Law Fraud
### Against Bullock, Tippie, Wareham, Winger, Humphreys, PwC, and TD

402.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

403.    This Count is brought pursuant to common law against Defendants Bullock, Tippie, Wareham, Winger, Humphreys, PwC, and TD Securities.

-134-

404.     As alleged herein, Defendants Bullock, Tippie, Wareham, Winger, and Humphreys made false representations of material facts by, among other things, approving and signing Forms 10-K, Forms 10-Q, Offering Memoranda, and Registration Statements which contained materially false financial statements and other materially false statements regarding the Company's financial condition.  Defendant PwC made misrepresentations of material facts by, among other things, issuing unqualified opinions on the Company's financial statements, and falsely stating that PwC's audits of those financial statements had complied with GAAS and that the financial statements fairly presented the Company's financial position in accordance with GAAP. Defendant TD Securities made misrepresentations of material facts regarding the Company's financial condition by, among other things, preparing the Road Show materials, participating in the preparation of the Offering Memoranda, and organizing and participating in the Road Shows where they failed to correct false statements made by management.

405.     In making their material false representations regarding the Company's financial condition, each of the Defendants either knew that those representations were false or acted with reckless disregard for the truth or falsity of those representations.

406.     Each of the Defendants knew and intended that investors would act in reliance upon the representations of the Company's financial condition as set forth in the Company's financial statements, Forms 10-K, Forms 10-Q, Forms 8-K, press releases, Road Show materials and presentations, Offering Memoranda, and Registration Statements.

407.     By virtue of an agreement between Plaintiff and TCW, TCW made the investment decisions on behalf of Plaintiff.  As a result, reliance by TCW constitutes reliance by Plaintiff.

-135-

408.    TCW read the Defendants' false and misleading statements of the Company's financial condition, and relied upon those statements, as well as the statements made at the LES Road Show, when deciding to purchase Bonds on behalf of Plaintiff, not knowing that they were false and misleading.  TCW also relied on those statements when deciding to cause Plaintiff to hold rather than sell the Bonds prior to March 6, 2000.  Plaintiff and TCW had a right to rely, and reasonably relied, on the Defendants' false statements, particularly given the clean audit opinion from the Company's auditor, PwC.

409.    At the time Plaintiff purchased the Bonds, and at all times prior to March 6, 2000, neither Plaintiff nor TCW knew of any of the Defendants' false representations.

410.    Plaintiff suffered damages as a direct and proximate result of purchasing and holding Bonds in reliance upon Defendants' false representations.

## JURY DEMAND

411.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiff against all Defendants,

jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants,

together with interest thereon;

B.    Awarding punitive damages in favor of Plaintiff on Plaintiff's claims for common

law fraud;

C.    Awarding Plaintiff prejudgment interest and/or opportunity cost damages;

D.    Awarding Plaintiff the fees and expenses incurred in this action, including

allowance of fees for Plaintiff's attorneys and experts; and

E.    Granting such other and further relief as the Court may deem just and proper.

DATED: _2/22/05_

Pope D. Johnson, III
Federal I.D. No. 2206
McCutchen, Blanton, Johnson & Barnette, L.L.P.
P.O. Drawer 11209
Columbia, SC  29211-1209
(803) 799-9791
Local Counsel for Plaintiff

Stuart M. Grant
Megan D. McIntyre
Grant & Eisenhofer P.A.
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE  19801
(302) 622-7000
Lead Counsel for Plaintiff

-137-